MESAG ASELBEKIAN & others *vs.* MASSACHUSETTS TURNPIKE AUTHORITY.

Worcester. September 26, 1960. — November 14, 1960.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, & CUTTER, JJ.

*Evidence,* Of value; Plan; Judicial discretion; Opinion: expert.

At the trial of a petition for assessment of damages for a taking of land, where an expert for the petitioner testified as to his opinion of values and the damage from the taking and generally as to a potential use of the land for development into house lots, there was no abuse of discretion in admitting in evidence as an exhibit an informal preliminary plan prepared by the witness showing how the land could be so developed, or in allowing him to testify as to the "cash values of the various lots as shown on the plan."

PETITION, filed in the Superior Court on May 2, 1956.

The case was tried before *Bolster, J.*

*J. Burke Sullivan,* for the respondent.

*Thomas S. Carey,* for the petitioners.

CUTTER, J. This is a petition for the assessment of damages to land and buildings of the petitioners caused by two eminent domain takings made in 1955 by the authority. The case was referred to an auditor who filed a report in which he found for the petitioners in the sum of $107,000 with interest. After hearing a motion to recommit this report, a judge of the Superior Court, subject to exceptions[1] by the petitioners, struck out the auditor's report, discharged the auditor, and referred the case to a new auditor.

No hearings were held before the new auditor and his appointment was later revoked. The case was then tried before another judge of the Superior Court and a jury. There was a verdict of $110,000 for the petitioners. The

---

[1] It was stated at the arguments that these exceptions, presented in the petitioners' bill of exceptions, would be waived if the authority's exceptions were overruled by this court.

authority's bill of exceptions presents questions arising out
of the admission in evidence of a plan of possible develop-
ment of the petitioners' land and of certain testimony of
expert witnesses discussing that plan.

1.  Before the takings the petitioners owned fifty-one
and one half acres of land in Southborough.  On this land
they conducted a dairy business from 1929 until the takings
in 1955.  There were two dwellings, a cow barn, two silos, a
dairy building, and a two car garage on the property.
These buildings were not taken.  One taking was of an area
of 11.62 acres, 300 feet wide and about 1,525 to 1,660 feet
long with two adjacent small parcels.  The second taking,
principally for the construction of police barracks, was of
7.69 acres north of and adjacent to the first taking.  The
300 foot strip crossed from east to west substantially the
whole width of the petitioners' property, separating the
dwellings and farm buildings and some land in the southern
part of the land from the northern part of the property.
The second taking deprived the petitioners of a substantial
amount of frontage on Breakneck Hill Road.  This high-
way crossed the land from north to south.  Its location was
to be substantially changed in the area north of the turn-
pike because of the turnpike construction.  The turnpike
surface and the area of the police barracks are now about
sixteen feet above the original grade of the petitioners'
land.  There was evidence that drainage from filled areas
has caused about five acres of the petitioners' remaining
land to become a swamp.  The dwellings are close to the
southerly edge of the turnpike.

A plan of the property, with the takings superimposed,
was introduced in evidence.  There was testimony that the
usefulness of the property for a dairy farm had been de-
stroyed and all the expert witnesses appeared to agree that
the highest and best use of this property would be for de-
velopment into house lots, although an expert called by the
authority testified that the "imminence of . . . [such a
development] was not too great."  One Maher, an expert
called by the petitioners, testified in some detail about the

characteristics and value of the land and buildings before and after the takings, and stated that in his opinion the petitioners' total damage from the takings was $155,150, included in which was damage from the actual takings of land of $59,550, and damage to the remaining land of $58,000. After general discussion of the damage to the potential development of the land for house lots, Maher testified that he had prepared a plan "showing how the petitioners' property could be developed into lots." Subject to the authority's exception to the whole line of questioning, this plan was admitted as an exhibit. The witness, "using [the] [e]xhibit . . . to explain his testimony, testified to [the] cash values of the various lots as shown on the plan." Another expert witness, Ghelli, called by the petitioners, also used the plan (without new objection or exception so far as appears from the record) to explain his testimony and the reasons for his opinion that the total damage to the petitioners was $179,200. One Cassell, an expert called by the authority, expressed the opinion that the total damage was $19,700.

The measure of damages for the taking of land by eminent domain is the market value, at the time of the taking, of the land actually taken and the decline, attributable to the taking, in the market value of the owner's remaining land. The potential uses at the time of the taking of the land affected by the taking may have bearing upon these values. See *Tigar* v. *Mystic River Bridge Authy.* 329 Mass. 514, 517–519; *Kinney* v. *Commonwealth,* 332 Mass. 568, 570–572; *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authy.* 335 Mass. 189, 193–194; *Brush Hill Dev. Inc.* v. *Commonwealth,* 338 Mass. 359, 361–362; *Ford* v. *Worcester,* 339 Mass. 657, 661–663; *Southwick* v. *Massachusetts Turnpike Authy.* 339 Mass. 666, 669–672; *Boston Edison Co., petitioner, ante,* 86, 92–93. In the *Boston Edison* case, this court said, "So long as . . . an expert . . . is not permitted to explore unreasonably the details of particular plans of development still essentially speculative or is not unfairly precluded from giving testimony bearing upon relevant aspects of value, a judge . . .

has reasonable discretion in determining the extent to which the witness may explain the reasons supporting his conclusions.'' In that case it was held that the judge in his discretion might ''permit an expert witness to state the reasons for his opinion and to explain those reasons with reference to potential uses of the land and to plans or chalks illustrative of such uses.''

The problem of the trial judge is to avoid unreasonably restricting the efforts of the owner fairly to show the effect of the taking upon the market value of the affected property at the time of the taking (see e.g. the *Newton Girl Scout,* the *Brush Hill Dev. Inc.,* and the *Southwick* cases, *supra*) without permitting damages to be inflated by unduly detailed and confusing proof of speculative future uses of property having no very direct relationship to market values at the time of the taking. See *Greenspan* v. *County of Norfolk,* 264 Mass. 9, 11. In the present case, the trial judge did not exceed the bounds of a sound discretion. Before any use was made of the plan, one expert witness had testified extensively about the value of the property for residential purposes. There thus was already evidential basis for considering that in 1955 the possibility of a development on this land had relevance to its then market value. The exhibit appears to be a blue line print from a somewhat informal preliminary plan, carefully drawn but without the finished draftsmanship usual in a plan filed with public officials. Nothing in the exhibit or the testimony suggests that the plan was put forward as a project already in progress. The plan, of course, had no proper place in this case except to illustrate the physical possibility that the land in 1955 could have been divided into lots of about 15,000 square feet each, with a minimum frontage of 100 feet either on a then existing highway or on a new street, a matter which we think could have been stated with less risk of misleading the jury without use of a plan. The judge's charge does not appear in the record. No exceptions to it appear to have been saved. We thus have no reason to suppose that he did not adequately instruct the jury about the purposes

for which they were entitled to consider the plan, if they saw fit to give it any weight.

The judge, in his discretion, could reasonably have refused to admit the plan as an exhibit, while permitting it to be used as a chalk. He could have required each expert witness to relate his testimony about the possibility of residential use somewhat more closely to its immediate effect upon 1955 market values without permitting him to dwell in as much detail upon the values which they assigned to individual lots. In what he in fact did, however, we perceive no abuse of discretion, even if somewhat greater restrictions upon the use of this type of testimony might have been preferable.

2. Since the authority's exceptions to the admission of evidence must be overruled, we treat as waived the petitioners' exceptions to the discharge of the original auditor and to the action striking out his report.

*Respondent's exceptions overruled.*
*Petitioners' exceptions dismissed.*