PAT F. NONNI & others, trustees, *vs.* COMMONWEALTH.

Plymouth. May 7, 1969. — June 24, 1969.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL,
& REARDON, JJ.

*Evidence,* Public record, Of value, Judicial discretion. *Practice, Civil,*
     Requests, rulings and instructions; Exceptions: what questions open.

At the trial of a petition for assessment of damages for a taking of land
     in a town by eminent domain, there was no error in the admission in
     evidence from a town record book of the complete record concerning
     certain building permits issued for the land, including pencil notations
     possibly voiding the permits and contended by the petitioner not to
     constitute a reflection of official action. [267]
At the trial of a petition for assessment of damages for a taking by emi-
     nent domain of a strip of land for highway purposes through a parcel
     of about one hundred thirty-three acres containing gravel, it was
     within the trial judge's discretion to admit testimony by a general
     contractor called by the respondent as to the price he had paid almost
     three years before the taking for a sixteen acre tract not useable for
     gravel removal or a gravel processing plant and located four to five

miles from the petitioners' property, and to exclude testimony by one in the gravel business called by the petitioners as to the price he had paid in the year before the taking for a seventy acre tract useable for gravel removal and a gravel processing plant and located about seven and one-half miles from the petitioners' property. [268–269]

At the trial of a petition for assessment of damages for a taking by eminent domain, there was no error in the judge's denial of requests by the petitioners for rulings which related to issues of fact or matters adequately covered in the charge. [269–270]

The measure of damages for a taking of part of a parcel of land by eminent domain is the market value, at the date of taking, of the land taken and the diminution in value, due to the taking, of the owner's remaining land. [270]

General criticisms of the charge which were not made the subject of exceptions at the trial of an action cannot be considered by this court. [270]

PETITION filed in the Superior Court on December 3, 1963.

The case was tried before *Lurie, J.*

*Francis V. Matera* for the petitioners.

*Robert H. Gordon,* Assistant Attorney General, for the Commonwealth.

WILKINS, C.J. This petition is for the assessment of damages caused by a taking of land in Middleborough for highway purposes by the Commonwealth. G. L. c. 79. The jury returned a verdict of $1,800, which the petitioners, Pat F. Nonni, Edward F. Palladino, and Rocco Palladino, trustees of the Palnon Realty Trust, contend is inadequate. Their exceptions are to rulings on evidence and to the charge.

The taking, made on February 14, 1962, was of a 300 foot strip, containing 10.32 acres, extending across and bisecting the property, leaving approximately fifty acres to the north and seventy acres to the south without connection between them. Prior to the taking the land was an irregular tract of 133.29 acres, which on the southwest was bounded forty feet on West Grove Street (Route 28) and on the northeast was bounded 299 feet on Centre Street. The other boundaries were on land of others "with no access to any public ways."

"The land was hilly with mounds of earth and areas of marshland containing a high water table with sufficient water, fed by a stream traversing the northerly portion and connecting with a cranberry bog and water hole or pond,

slightly above the middle portion . . . . Approximately
. . . (80%) of the tract was upland and the remaining land
was low-land and water." Of the 133.29 acres approximately
eighty acres were usable for excavation as a gravel pit, and
contained 1,500,000 cubic yards of gravel. The remaining
"fifty plus" acres were "generally low-land and water."

The taking was developed and made part of Route 144, a
nonaccess State highway bordering 1,430 feet on the north
portion and 1,500 feet on the south portion. The strip
isolated to the north the major water supply, the stream,
cranberry bog, and water hole from the southern part,
which contains the major hilly area and source of gravel.

In 1953, one Chroniack, the owner, offered the Palladinos
a two-thirds interest in the property for their efforts in de-
velopment of the area as a source of gravel. Beginning in
1954, Edward Palladino entered upon the land with bull-
dozers and other equipment, opening gravel roads connecting
with existing cart paths. Gravel in small quantities was
removed by Edward and other contractors. "The work of
removing gravel and the bulldozing of roads continued
sporadically and during the years 1954 to 1963 inclusive."
The excavation and removal "during the years" was done
by Edward and other contractors under agreement with
him. In 1956 the trust was formed, and Nonni acquired
Chroniack's one-third interest. Title to the tract was then
put in the names of the trustees.

On April 1, 1960, the petitioners and an adjoining owner
filed with the board of zoning appeals an application for a
permit to allow operation of a sand and gravel plant. After
a hearing on May 16, 1960, the board voted to grant a
"variance" for a gravel plant operation, finding, among
other things (see G. L. c. 40A, § 15), that "a non-conforming
use of this land existed as a gravel pit, because sworn testi-
mony was given that gravel was sold from this land prior to
June 16, 1958 . . . when zoning was adopted."

The petitioners hired an engineer who entered upon the
land and made gravel tests. Their architect prepared plans
for the gravel processing plant site, and for buildings,

machinery, and equipment to be used with it. On January 2, 1962, the petitioners filed with the town manager a plan prepared by their architect showing the site and three buildings proposed to be built for the processing plant, and requested building permits. The record book of permits kept at the office of the town manager contained records in ink of three building permits (numbered 369, 370, and 371) issued on January 23, 1962, respectively, for a pump house, an office and maintenance building, and a sand and gravel plant, all to be located north of West Grove Street. There also appeared in the record in pencil: "Issued in error. Failed to make use of variance within required time . . . (Voided)."

1. There were three exceptions to evidence.

(a) One Martenson, called as a witness by the respondent, testified that he was acting town manager, "under whose office control of the record book . . . [was] kept." He did not make the entry in pencil, did not know who made it, and never saw the entry before he was asked to bring the book to court. He could not state whether "Voided" referred to the permits or to the entry in pencil. Subject to the petitioners' exception he testified that the record in full was: "'Permits number 369, 379 [*sic*], and 371 issued in error. Failed to make use of variance within required time.' This is in parenthesis. And then outside it says 'Voided.'"

The petitioners argue that the notation in pencil is not part of the record, and that the ruling admitting it was error. We do not agree. The complete record could be shown. This has been the rule respecting documents. *Commonwealth* v. *Keyes*, 11 Gray, 323, 324–325. *Noble* v. *Fagnant*, 162 Mass. 275, 280, 286. *Sullivan* v. *Morse*, 271 Mass. 501, 504. Cf. *Commonwealth* v. *Monahan*, 349 Mass. 139, 168–169. There was compliance with G. L. c. 233, § 76. We cannot accept the petitioners' contention that because the "action" was not voted by the board of zoning appeals, it never became the official action of the town. The appellate record before us is defective in not including the by-law or anything to show who was empowered to grant permits.

There is no proof that there had been any appeal to the board of zoning appeals. See G. L. c. 40A, §§ 13, 15. Nor can it be assumed without proof that the record respecting the permits is wrong.

(b) One Byrne, a general contractor called by the respondent, testified that on March 11, 1959, he purchased a sixteen acre tract in Middleborough approximately four to five miles from the petitioners' property. It was fairly level wooded land at about street grade, and did not enjoy a use for gravel removal or for a gravel processing plant, either by nonconforming use or by permit. Subject to the petitioners' exception, he was allowed to testify that he paid $1,000 for this tract.

(c) One Lorusso, called by the petitioners, testified that he had been in the sand and gravel business for over thirty-four years. In 1961 he purchased land in Bridgewater, and until 1965 conducted a sand and gravel plant and asphalt plant business. The property contained seventy acres, situated 7.6 miles from the petitioners' land. It fronted on Plympton Street, and ran back to the Taunton River from which was readily available a supply of water to conduct a sand and gravel processing plant. When purchased, there existed a nonconforming use for the removal of gravel and a permit for the operation of a sand and gravel processing plant. Based upon examination he had an estimate as to the quantity of material that was contained in his land for gravel plant purposes. The amount was excluded and counsel made an offer of proof that twenty-five per cent of the seventy acres had been used up. The witness was not allowed to testify to the purchase price. Subject to the petitioners' exception it was excluded. An offer of proof was made that he paid $62,000.

The familiar principles governing the admissibility of comparable sales in eminent domain cases do not require restatement. Much of necessity must be left to the discretion of the trial judge. *Congregation of the Mission of St. Vincent de Paul* v. *Commonwealth*, 336 Mass. 357, 359. *Gregori* v. *Springfield*, 348 Mass. 395, 396. *H. E. Fletcher Co.* v. *Com-*

monwealth, 350 Mass. 316, 324–325. *Alden* v. *Commonwealth,* 351 Mass. 83, 86–87.

It was within the trial judge's discretion to exclude the evidence as to the Lorusso property, although we would not have disagreed if it had been admitted. The ruling on the Byrne property was also within his discretion.

2. We now consider the exceptions to the charge. No formal written requests for instructions were presented before the final arguments. See Rule 71 of the Superior Court (1954). At the conclusion of the charge the judge permitted four requests for instructions to be orally presented by counsel for the petitioners. See *Robertson* v. *Boston & No. St. Ry.* 190 Mass. 108, 109; *Commonwealth* v. *Hassan,* 235 Mass. 26, 31–32; *Gibbons* v. *Davis,* 324 Mass. 286, 288. These were denied, and the petitioners excepted.

(a) The first request was that at the time of the taking (February 14, 1962) there were in full force as a matter of law "permits and licenses" for the conduct of a gravel processing plant and the removal of gravel. This could not properly have been given as true as a matter of law. Although all the material evidence on this issue has not been included in the bill of exceptions, enough does appear to reveal that a factual question of the effect of failure to take timely action pursuant to the "variance" had been raised and was unresolved.[1]

(b) The second request was that the judge instruct that the jury must consider the highest and best use to which this property could be put, such as the owner at the time of the taking was putting it with permits for gravel plant operations and gravel removal. *Tigar* v. *Mystic River Bridge Authy.* 329 Mass. 514, 517. *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authy.* 335 Mass. 189, 193–194. *Ford* v. *Worcester,* 339 Mass. 657, 662–663. *Joseph De Vries & Sons, Inc.* v. *Commonwealth,* 339 Mass. 663, 664–665. This was denied, and the petitioners excepted. The judge

---

[1] The record states that gravel removal "continued sporadically" from 1954 to 1963, and that the judge charged without objection that "there had to be the use of an allowed variance within a year of the granting of the permit."

stated that he had adequately covered this question. We agree.

(c) The third request was that the judge instruct that in considering the value of the land after the taking the jury must consider how the taking affected its highest and best use, which must be given consideration as being for gravel plant operations and gravel removal. This was substantially the same as the first two requests and is covered by what has been said. It also comes close to asking a finding on conflicting testimony as to what was the highest and best use.

(d) The fourth request involves the entry in the record book which was the subject of the first exception to evidence. This request was that "all matters which become actions of the town . . . are only such matters as appear in the records . . . which arise out of the minutes of their meetings, and is the vote of the members of the Zoning Board of Appeals." See 1 (a), *supra,* where the matter is fully covered.

The petitioners are entitled to be compensated for the fair market value of that of which they have been deprived. In determining this, "all the uses to which the property is reasonably adapted may be considered." *Smith* v. *Commonwealth,* 210 Mass. 259, 261. *Ford* v. *Worcester, supra.* The measure of damages is the market value, at the date of taking, of the land taken and the diminution in value, due to the taking, of the owner's remaining land. *Aselbekian* v. *Massachusetts Turnpike Authy.* 341 Mass. 398, 400, and cases cited. The judge's charge sufficiently dealt with these matters. General criticisms of the charge not the subject of exceptions cannot be considered.

We have considered every ruling definitely made the subject of exception. To demonstrate error the burden was on the petitioners to take definite exception to each specific ruling they assert to be incorrect. This they have failed to do.

*Exceptions overruled.*