DOUGLAS ENVIRONMENTAL ASSOCIATES, INC., & another[1] *vs.*
DEPARTMENT OF ENVIRONMENTAL PROTECTION & others[2];
TOWN OF WEBSTER & others,[3] interveners.

Suffolk. December 11, 1998. - March 1, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Department of Environmental Protection. Administrative Law,* Record. *Damages,* Eminent domain. *Eminent Domain,* Damages. *Value. Practice, Civil,* Moot case.

This court undertook to consider issues, reported by a Superior Court judge relative to decisions of the Department of Environmental Protection denying a permit for a landfill facility but mooted by a land taking by the Commonwealth, which were relevant to an anticipated land damage action. [72]

In an appeal under G. L. c. 30A, § 14, to review a decision of the Department of Environmental Protection (DEP) made pursuant to G. L. c. 111, § 150A, the judge properly exercised her authority under § 14 (4), in accordance with analogous Federal proceedings, to allow additions to the record to include any documents or materials considered directly or indirectly by DEP, including evidence contrary to DEP's position, and her discretionary assessment of what the record should contain was reasonable. [74-75]

The ruling of a Superior Court judge, remanding a matter to the Department of Environmental Protection for the issuance of a final permit for a landfill facility subject to reasonable conditions, was, insofar as that order bore on the value of the subject property that had been taken by the Commonwealth during the pendency of the case on appeal, not in excess of the judge's authority. [75-78]

CIVIL ACTION commenced in the Superior Court Department on May 6, 1993.

The case was reported to the Appeals Court by *Margot Botsford,* J. The Supreme Judicial Court granted a request for direct review.

*William L. Pardee,* Assistant Attorney General, for the defendants.

[1] Patricia I. Barletta, executrix of the estate of Vincent Barletta.

[2] The Commissioner of Environmental Protection, the Deputy Commissioner of Environmental Protection, the Executive Office of Environmental Affairs, and the Secretary of the Executive Office of Environmental Affairs.

[3] Eighteen citizens of the Commonwealth.

*Kenneth L. Kimmell* for the interveners.

*David E. Lurie* for the plaintiffs.

*Howard J. Hirsch & Charles C. Caldart*, for Massachusetts Public Interest Research Group & others, amici curiae, submitted a brief.

WILKINS, C.J. A judge in the Superior Court has reported, pursuant to Mass. R. Civ. P. 64, as amended, 423 Mass. 1410 (1996), the propriety of three orders that she entered in appeals by the plaintiffs from decisions of the defendant Department of Environmental Protection (DEP). DEP denied Douglas Environmental Associates, Inc. (DEA), a final permit to construct a landfill facility in Douglas. See G. L. c. 111, § 150A. DEP based its denial on its conclusion that "the proposed project would pose a threat to the environment due to adverse impacts on the local population of Marbled Salamanders," a species listed as a "Threatened Species" under the Massachusetts Endangered Species Act (MESA), G. L. c. 131A.[4] We allowed DEA's application for direct appellate review.

Shortly after oral argument before this court, the Commonwealth, acting pursuant to St. 1998, c. 221, took the wholly undeveloped 289 acres of industrially zoned land that DEA owned abutting the Douglas State Forest and on which DEA had intended to build an integrated solid waste management facility. The facility was to be developed in four phases, each expected to last about five years.[5] The land taking has made the issues in this case moot. DEP and DEA have, however, asked that we decide the reported issues, at least insofar as they may bear on the compensation due to DEA as a result of the taking. We need not consider the concerns of the interveners who are no longer subject to the possibility of a landfill being operated on the site.

A synopsis of the protracted administrative and judicial proceedings in connection with DEA's attempt to obtain approval of its landfill project will explain the issues reported to us and will guide us to those issues that we can resolve that may bear on the expected eminent domain action. DEA began

---

[4]A species is "Threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range" or if it is "declining or rare" and "likely to become endangered in the foreseeable future." 321 Code Mass. Regs. § 10.03(6)(b) (1993).

[5]DEP's permit denial was for the first phase which called for the use of thirty-five acres of the site.

its quest in 1987 with a site assignment proceeding before the Douglas board of health. DEP affirmed the site assignment in March, 1991. The town of Webster and several individuals appealed DEP's decision to the Superior Court. In September, 1992, a Superior Court judge upheld DEP's decision, and the site assignment approval became final.

Later that month, DEP issued a draft permit to DEA authorizing the landfill to accept 1,500 tons per day (tpd) of solid waste, of which 600 tpd could be municipal solid waste. In April, 1993, after two public hearings and intense opposition to the proposed facility, DEP denied DEA a final permit for the project. DEA appealed pursuant to G. L. c. 111, § 150A, and G. L. c. 30A, § 14, asserting, in part, that DEP had based its decision on information not disclosed to DEA or disclosed too late for meaningful comment. On December 9, 1993, the Superior Court judge, who has reported issues to us, vacated the permit denial and remanded the matter to DEP for further proceedings.[6]

Following DEP's April permit denial and while DEA's appeal was pending, DEA conducted a habitat evaluation and wildlife inventory of the site. A report, dated June, 1993, concluded that none of the previously identified protected species was present on or near the site. The survey revealed, however, the presence of a threatened species, the marbled salamander. The June, 1993, report and a further report of April, 1994, suggested a variety of measures designed to mitigate the facility's impact on the salamanders. DEA proposed (a) a buffer zone between the facility site and breeding pools to preserve access to upland habitat, (b) a low "salamander wall" at the northwestern perimeter to prevent salamanders from entering the site and to deflect their travel, and (c) a chain-link perimeter fence around the entire facility.

In January, 1995, more than one year after the judge remanded the matter to DEP, DEP issued a partial decision and found that the reasons for its April, 1993, permit denial no longer obtained. However, due to the discovery of the marbled salamander, DEP decided that further studies were needed. DEP also reopened the question of need for the facility in light of allegedly changed circumstances. In July, 1995, DEA submitted

---

[6]One of the three orders whose propriety the judge has reported to us is this order of December 9, 1993. DEP makes no concerted argument here that the December 9, 1993, decision and order was unlawful. In any event, that decision has no bearing on the expected eminent domain action.

additional reports on the marbled salamander to DEP detailing its proposed mitigation measures.

In September, 1995, DEP again denied DEA a permit. DEP concluded that the landfill as proposed would disturb the upland feeding and migratory habits of the marbled salamander and thus would constitute a "taking" of the salamanders in violation of MESA, G. L. c. 131A, § 2. DEP concluded further that at least a 640 foot buffer would be needed between the breeding pools and the western edge of the facility footprint and that such a buffer would require major design changes in DEA's proposal. The department denied the permit only because of the absence of an adequate buffer zone to protect the salamanders. It added, however, that, if it were to reach the issue of the need for disposal capacity, it would conclude that, premised on its estimate of Statewide disposal capacity in 1996 and 2000, DEA could accept 1,500 tpd each day of nonmunicipal solid waste but no municipal solid waste. Such a ruling would be significant for the economic viability of the proposed landfill project because municipal solid waste is financially more beneficial than other solid waste.

DEA appealed from the decision, presenting, among various claims, an appeal pursuant to G. L. c. 30A, § 14. General Laws c. 111, § 150A, directs that G. L. c. 30A, § 14, governs the standard of review for a decision made under § 150A, even though the proceeding before DEP is not an adjudicatory proceeding. The second of the orders whose propriety the judge has reported concerns the content of the appellate record. On June 4, 1996, the judge decided, on DEA's motion, that certain documents should be added to the administrative record that DEP had filed. Section 14 (4) of G. L. c. 30A was not written with a focus on the appropriate content of the record on appeal from a non-adjudicatory proceeding of the sort involved in this case. See G. L. c. 30A, § 14 (4) & (5).[7] The judge, using her authority under § 14 (4) to allow additions to the record, appropriately relied on Federal cases which, in similar circumstances, have held that the record should consist of any docu-

[7]Relevant portions of G. L. c. 30A, § 14 (4) & (5), provide as follows:

"(4) . . . The record shall consist of (*a*) the entire proceedings, or (*b*) such portions thereof as the agency and the parties may stipulate, or (*c*) a statement of the case agreed to by the agency and the parties. . . . The court may require or permit subsequent corrections or additions to

ment or material that the agency decision makers directly or indirectly considered, including evidence contrary to the agency's position, but excluding documents that set forth motives and thought processes used in arriving at the agency's decision. See, e.g., *Waltham* v. *United States ·Postal Serv.*, 786 F. Supp. 105, 116-117 (D. Mass. 1992), aff'd, 11 F.3d 235 (1st Cir. 1993); *Norfolk* v. *United States Army Corps of Eng'rs*, 137 F.R.D. 183, 185 (D. Mass. 1991), aff'd, 968 F.2d 1438 (1st Cir. 1992); *National Wildlife Fed'n* v. *Burford*, 677 F. Supp. 1445, 1457 (D. Mont. 1985), aff'd, 871 F.2d 849 (9th Cir. 1989). See also *Bar MK Ranches* v. *Yuetter*, 994 F.2d 735, 739-740 (10th Cir. 1993); *Thompson* v. *United States Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989); *Miami Nation of Indians of Ind.* v. *Babbitt*, 979 F. Supp. 771, 775-776 (N.D. Ind. 1996). Only such a record could permit a proper review to determine whether the agency decision was based on substantial evidence or was an abuse of discretion. See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981); *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966). The judge's discretionary assessment of what the record should contain was reasonable. None of the documents added to the record has any significant influence on our conclusions. The ruling on the content of the record has no bearing on DEA's anticipated action for damages caused by the landtaking, and we see no reason to pass on the judge's ruling beyond what we have said.

What is significant for the purposes of determining DEA's damages caused by the taking is whether it was certain, or at least likely, that DEA would obtain a permit for a landfill operation on the site. If it was, the use of the land for landfill purposes could be the basis for an opinion on the fair market value of the land.[8] Fair market value is determined on the basis of the highest and best use to which property could reasonably be put. See

---

the record when deemed desirable.

"(5) The review shall be conducted by the court without a jury and shall be confined to the record, except that in cases of alleged irregularities in procedure before the agency, not shown in the record, testimony thereon may be taken in the court."

[8]If some other use permitted (or likely) on this industrially zoned site is a higher and better use than the contemplated landfill, what we say here probably will be of no help in deciding the question of damages for the land taking.

G. L. c. 79, § 12; *Skyline Homes, Inc.* v. *Commonwealth*, 362 Mass. 684, 686 (1972). Existing zoning restrictions or special permit requirements limit available uses and may affect the fair market value of property. See 4 P. Nichols, Eminent Domain § 12C.03[1], at 12C-71 (rev. 3d ed. 1990). However, the fact that a potential use is prohibited or restricted by law at the time of the taking does not preclude its consideration if there was a reasonable prospect of rezoning or acquiring a special permit. See *Skyline Homes, Inc.* v. *Commonwealth*, *supra* at 687; *Colonial Acres, Inc.* v. *North Reading*, 3 Mass. App. Ct. 384, 386 (1975) (petitioner entitled to demonstrate a reasonable probability that zoning restriction prohibiting use of land as a sanitary landfill would be removed). Property must not, however, be valued as if a needed governmental approval were an accomplished fact. Rather, the trier of fact should consider possible uses not yet approved "with discounts for the likelihood of their being realized and for their futurity." *Skyline Homes, Inc.* v. *Commonwealth*, *supra* at 686. See *Roach* v. *Newton Redevelopment Auth.*, 8 Mass. App. Ct. 618, 624 (1979), *S.C.*, 381 Mass. 135 (1980). Obviously, "[w]here it is not shown that a suggested use would be profitable, or where it appears that the operation cannot be carried on except at a loss, the prospect of use for such a purpose is not a proper element of value" in an eminent domain proceeding. 4 P. Nichols, *supra* at § 12B.12, at 12B-105 – 12B-107 & n.5.

It is, therefore, important to decide the lawfulness of the judge's order of July 24, 1997, which remanded the matter to DEP for the issuance of a final permit, subject to reasonable conditions, including protection of the marbled salamander, and authorizing DEA to accept 1,500 tpd of solid waste, of which 600 tpd could be municipal solid waste. This order is the third order whose correctness the judge reported for appellate consideration. DEP argues that the judge exceeded her authority in vacating DEP's decision and ordering a permit to issue.

We shall consider DEP's decision and the judgment vacating that decision only as it may bear on the valuation of DEA's property for landtaking purposes. It seems reasonably clear that, but for the taking, DEA would have been entitled to operate a landfill on the site, following the inevitable approval of conditions for the protection of the marbled salamander. Those conditions would have appeared either on the permit that the judge ordered be issued or as a result of a subsequently approved permit application.

One question, not resolved by the judge's decision or by DEP, is the extent of the buffer zone that DEA would have been obliged to maintain. The judge concluded that (a) the record warranted DEP's decision to reject a 282 foot buffer zone along the eastern side of the breeding pools, (b) the record did not support a 1,000 foot buffer zone, and (c) the record weakly supported a 640 foot buffer zone.[9] A 640 foot buffer zone would require a reconfiguration of the proposed site. For the purposes of DEA's damage claim, it is appropriate to assume, based on the conclusions reached by the judge, that DEA would have received a permit subject to a 640 foot buffer zone and other protective measures. It would be further reasonable to assume that the permit with conditions would have been issued by the date of the taking.

The other question bearing on valuation concerns the extent to which DEP would have allowed DEA to receive municipal solid waste (MSW).[10] DEP stated in its decision, as we have already noted, that, if it had issued a permit, it would have not allowed DEA to accept any MSW. That decision reversed DEP's earlier determination that DEA would be permitted to accept 600 tpd of MSW. Based on the 1992 Statewide methodology and select updated data, DEP concluded that in 1996 and in 2000 there would be Statewide excess landfill capacity for MSW.

The judge ruled that DEP's change of position on MSW disposal for DEA's facility was arbitrary, capricious, and an abuse of discretion. She concluded that DEP could not in fairness abandon the allocation made in DEA's draft permit. She also noted, quite correctly, that the extraordinary length of the

---

[9]We agree that a 1,000 foot buffer zone is unsupported by substantial evidence. We concur with the trial judge's determination that DEP was warranted in rejecting the buffer zone and corridor advanced by DEA. We further agree, however, that rejection of DEA's mitigation measures does not translate into substantial evidence supporting the view that a 640 foot or 1,000 foot buffer is required.

The record indicates that the average migratory distance for the marbled salamanders is 640 feet and that the parties agree that these salamanders may travel as much as 950 feet. A wildlife biologist concluded that the minimum buffer zone should be 1,000, but there is nothing in the record to suggest why he selected 1,000 feet, as opposed to some other distance. The wildlife biologist's comments do not provide substantial evidence that a 1,000 foot buffer was needed. A Division of Fisheries and Wildlife letter of August 3, 1995, recommended a minimum buffer zone of 640 feet.

[10]Municipal solid waste consists of residential trash and commercial waste.

proceeding was not the fault of DEA and that DEP should not be allowed to "delay or defer action on DEA's permit application for reasons of its own, and then point to the passage of time as justifying a change in the basic premises on which the permit was originally going to be granted." We have doubts whether DEP in fact changed an existing policy concerning the time at which MSW rights would be established; it may be that DEP established a policy at long last. See *New York Times Co. v. Commissioner of Revenue*, 427 Mass. 399, 402-404 (1998). We agree, however, that the agency's delay in this matter worked unfairly to DEA's disadvantage. We further agree that the record warrants the judge's inference that DEP delayed the permitting process "until it was able to come up with estimates of capacity excess, and then imposed those new estimates on DEA." In these circumstances, it is appropriate that the assumption be made in the expected eminent domain proceeding that DEA's landfill permit would authorize it to accept 1,500 tpd of solid waste, of which 600 tons could be MSW.

The judgment of the Superior Court is vacated on the ground of mootness.

*So ordered.*