NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

12-P-223                                        Appeals Court


DONALD E. RODMAN & others[1]  vs.  COMMONWEALTH.


No. 12-P-223.

Norfolk.     April 9, 2014. - October 7, 2014.

Present:  Vuono, Meade, & Carhart, JJ.


Eminent Domain, Damages, Expert testimony.  Damages, Eminent
     domain.  Evidence, Expert opinion, Value.  Value.
     Practice, Civil, Eminent domain proceeding.



     Civil action commenced in the Superior Court Department on
March 4, 2002.

     The case was tried before R. Malcolm Graham, J., and a
motion for a new trial was considered by him.


     Thomas J. Carey, Jr. (Bradley C. Pinta with him) for the
plaintiffs.
     John D. Hampton, Assistant Attorney General, for the
Commonwealth.


     CARHART, J.  In 2001, the Commonwealth, through its

Department of Highways, took by eminent domain nearly five acres

of the plaintiffs' 57.7 acre parcel in the town of Foxboro

_____

     [1] John D. Murphy and Daniel J. Lynch, Jr.  The plaintiffs
are doing business as Bay State Development Association.

(town), along with an easement for drainage over an additional 1,112 square feet. As is their right pursuant to G. L. c. 79, §§ 8A and 14, after receiving a pro tanto award, the plaintiffs commenced this action seeking a greater damages award. Following trial, the jury awarded an amount less than the pro tanto award and the plaintiffs were ordered to repay the difference. Because we conclude that certain evidentiary rulings prevented the plaintiffs from offering relevant evidence of value, we vacate the judgment and reverse the order denying the motion for new trial.

Background. The plaintiffs' property is located on Route 1 south, across from Gillette Stadium, home of the New England Patriots football team. Approximately fourteen acres on the northern portion of the property has been used for many years as a "temporary" parking lot. The remaining acres were undeveloped at the time of the taking. Prior to the taking, the plaintiffs' property contained 1,800 feet of frontage on Route 1 south, a State road. The portion of the property taken included some 1,620 feet of the Route 1 frontage. Only 170 feet of original frontage on the northern portion of the property and nine feet of original frontage on the southern portion of the property remain. The zoning district in which the property is located requires an area of 80,000 square feet and 300 feet of frontage for buildable lots.

The property taken was used to complete an elevated ramp extending from the Gillette Stadium property, crossing Route 1 north and south, and pouring out over and along the plaintiffs' former property onto Route 1 south. There is no access to the ramp from Route 1 south or Route 1 north. The only means of access is from the Gillette Stadium property. Even before the taking, some of the plaintiffs' frontage consisted of a hill and ledge.[2]

Town zoning. In it zoning by-law, the town had created several zoning districts, some of which overlap. The use table in article 4 of the zoning by-law contains an exhaustive list of land uses and delineates for each zone whether the uses are permitted, not permitted, permitted with a special permit from the planning board, or permitted with a special use permit from the zoning board of appeal.[3] Section 4.00A of article 4 specifically prohibits all uses that are not noted in the table of use.

All of the property at issue is located in the Special Use (S-1) District (S-1 district) and also in the Economic

---

[2] The record reflects that following the taking by the Department of Highways, the town of Foxboro took another portion of the plaintiff's property for purposes of constructing a water tower and a roadway leading to it.

[3] For example, storage of high-hazard materials is not allowed in the Special Use (S-1) District but storage of low-hazard materials is allowed with a special permit.

Development Area Overlay District (EDA).  Both of these districts have stated goals of promoting economic development of the Route 1/Gillette Stadium corridor.  Indeed, the purpose of the EDA is to "supplement existing zoning regulations to provide regulating flexibility to encourage economic development." Hotels are permitted in the S-1 district with a special permit, as are commercial storage garages, truck terminals, general commodity and public warehouses, research and development facilities, and facilities for storage, manufacture, or processing of noncombustible materials and of low-hazard wares.

Section 9.13 of article 9 governs the EDA and provides that "[b]uildings and land uses within the [EDA] shall be governed by the pertinent regulations within the [S-1 district], except as modified by the provisions of this Section 9.13.  Where the base zoning regulations of the [S-1 district] differ from the provisions of Section 9.13, the provisions of Section 9.13 shall govern."  Section 9.13 further specifically identifies uses that "shall be permitted as of right" within the EDA.  Among the uses allowed as of right in the EDA are "[a]ll uses permitted as of right in the [S-1 district]" and hotels if located on the same lot as the stadium or on an adjacent or contiguous lot under common or affiliated ownership.  The EDA is silent as to special permit uses.

Trial.  At trial, the plaintiffs sought to show that their property could be developed to a much greater extent before the taking than after the taking.  To that end, their civil engineers created a plan demonstrating that the property could be divided into lots for which approval under the subdivision control law is not required (ANR lots), for uses including a hotel, office buildings, retail space, warehouse/manufacturing buildings, and the existing parking lot.  They contended that prior to the taking, they could have created three ANR lots for a variety of uses, plus the existing parking lot, and a subdivision of two additional lots in the rear of the property.  They posited that following the taking, the property could be developed as a subdivision only if access were via a subdivision road through the existing parking lot and that they would be limited by the town's 800-foot maximum for dead-end roadways.

Following the testimony of the plaintiffs' two expert engineers, including extensive cross-examination by the Commonwealth, the Commonwealth filed two motions in limine.  The first motion sought to prohibit the introduction of plans drawn by the plaintiffs' experts as to certain development uses and the testimony regarding those plans, and to strike such testimony already given.  The second motion sought to prohibit testimony regarding the development approach to value.  Specifically, in their first motion, the Commonwealth took the

position that the plans drawn up for the purpose of trial were inadmissible and testimony related to them should be prohibited and struck. The Commonwealth argued that any evidence of use for a hotel, warehouse, or manufacturing facility should be prohibited and struck as such uses are prohibited in the EDA on the plaintiffs' property. The Commonwealth contended that only the "as of right" uses listed in § 9.13 of the by-law are allowed in the EDA.[4]

With regard to the development theory of value, the Commonwealth in its second motion, citing CBI Partners Ltd. Partnership v. Chatham, 41 Mass. App. Ct. 923, 924 n.3 (1996), argued that because most of the property is essentially vacant and there were no pretaking plans to develop it, valuation must be done on a "whole subdivision[] basis," whereby comparable sales of similar, large parcels of unsubdivided and unpermitted land are used to determine fair market value. The Commonwealth sought to preclude any evidence of the value of individual lots derived from the property. The judge allowed both motions and specifically instructed the jury to disregard any evidence of potential development of a hotel, manufacturing, or warehouse use.

---

[4] The record does not disclose why the Commonwealth waited until mid-trial to bring its motions in limine. The Commonwealth suggests in its brief that it reviewed "in detail" the plans "at the break" and filed its motion after cross-examining the plaintiffs' experts.

The plaintiffs made an offer of proof that had their expert appraiser been allowed to consider the development of the locus as individual lots for hotel, manufacturing, and warehouse uses, he would have testified that the value of the property before the taking was $6,365,000 and after the taking was $4,300,000, resulting in damages of $2,065,000. Instead, he testified that the value before the taking was $5,885,000 and after the taking was $4,306,000, resulting in damages of $1,579,000. Ultimately, the jury awarded damages of $600,800, the exact amount the Commonwealth's expert testified to and less than the pro tanto award of $765,000.

Discussion. The factors guiding an award of damages in an eminent domain case were restated by the Supreme Judicial Court in Boston Edison Co. v. Massachusetts Water Resources Authy., 459 Mass 724, 730-733 (2011) (Boston Edison). While we recognize that the Boston Edison case was issued several years after the trial in this case, it does not deviate from existing law at the time of trial. "Where property is taken by eminent domain, the landowner is entitled to the fair market value of the property taken at the time of the recording of the order of taking, as well as 'damages for all injury to the part not taken caused by the taking or by the public improvement for which the taking is made.'" Id. at 731, quoting from G. L. c. 79, § 12. See Aselbekian v. Massachusetts Turnpike Authy., 341 Mass. 398,

400 (1960) (Aselbekian). "The fair market value of the property taken is the highest price that a hypothetical arm's-length willing buyer would pay to a hypothetical willing seller in a free and open market, based on the highest and best use of the property." Boston Edison, supra at 731. Consideration of the highest and best use is not limited to the use of the property at the time of the taking but includes "potential uses of land that a reasonable buyer would consider significant in deciding how much to pay." Ibid, citing Skyline Homes, Inc. v. Commonwealth, 362 Mass. 684, 686-687 (1972) (Skyline Homes). Indeed, it has long been the rule that in determining damages in an eminent domain taking case, "the jury should consider not only the value of the property taken[,] but also the effect of the taking upon that which is left; and in estimating the value of that which is taken, they may consider all the uses to which it might properly have been applied if it had not been taken." Kinney v. Commonwealth, 332 Mass. 568, 572 (1955), quoting from Maynard v. Northampton, 157 Mass. 218, 219 (1892) (Maynard). "In like manner, the effect on that which is left should be estimated in reference to all the uses to which it was naturally adapted before the taking. Damages are not to be awarded in reference to the peculiar situation or circumstances or plans of the owner, or to the business in which he happens to be engaged; but any and all of the uses to which the land considered as

property may profitably be applied, whether contemplated by the owner or not, may well be taken into the account by the jury." Ibid.

That is not to say that undeveloped properties are valued as if the reasonably likely future uses already exist. Nor is the fact that potential uses may be considered a license to speculate as to improbable future uses. Potential uses must be "reasonably likely" to be considered and "discounts for the likelihood of their being realized and for their futurity" are applied. Boston Edison, supra at 731, quoting from Skyline Homes, supra at 686. It has been said that a potential highest and best use must be "legally permissible, physically possible, and financially feasible" in order to be factored into a determination of value. Boston Edison, supra at 731 n.9. In addition, to be admissible, a potential use must be "sufficiently imminent to be taken into account by a reasonably prospective buyer in determining a property's price." Id. at 733. "But a property owner need not have taken recent steps to develop a property to its highest and best potential use in order for a reasonable buyer to recognize the likelihood that the property can be put to that use in the foreseeable future, discounting the property's value in view of the risk that a future potential use might be thwarted and that the profits from the potential use will be earned in future dollars." Ibid.

"While a judge may infer that a property owner's failure to develop the property in accordance with what the property owner now claims to be its best and highest use suggests that the potential use was not reasonably likely, a judge is not bound to that inference where . . . other evidence suggests that a reasonable buyer would recognize the reasonable likelihood of the potential use." Ibid.

"Existing zoning restrictions or special permit requirements limit available uses and may affect the fair market value of property." Douglas Envtl. Assocs., Inc. v. Department of Envtl. Protection, 429 Mass. 71, 76 (1999). "However, the fact that a potential use is prohibited or restricted by law at the time of the taking does not preclude its consideration if there was a reasonable prospect of rezoning or acquiring a special permit." Ibid.

To be sure, "[a] judge has a 'range of discretion' in deciding whether to admit evidence that a potential use is reasonably likely in the foreseeable future," particularly when that determination turns on whether the grant of a special permit is reasonably likely. Boston Edison, 459 Mass. at 732, citing D'Annolfo v. Stoneham Hous. Authy., 375 Mass. 650, 656 (1978). The task for the judge is to "avoid unreasonably restricting the efforts of the owner fairly to show the effect of the taking upon the market value of the affected property at

the time of the taking . . . without permitting damages to be inflated by unduly detailed and confusing proof of speculative future uses of property having no very direct relationship to market values at the time of the taking."  Boston Edison, 459 Mass. at 732, quoting from Aselbekian, 341 Mass. at 401.[5]

Consideration of potential uses.  Here, at the time of the taking, a modern professional football stadium was being constructed across the street from the plaintiffs' property.  In addition, zoning had been put in place with a stated goal of allowing regulatory flexibility in facilitating economic development of the "Route One corridor" in which the taken property was located.  There is little question that at the time of the taking, a reasonable buyer would have explored how the plaintiffs' property could be developed in determining how much to pay for it.  Even the Commonwealth's expert testified that performing due diligence prior to purchasing property is very important and would include "[l]ooking into zoning and what uses may or may not be allowed on the property."  Thus, whether the property is properly valued as a whole or by the lot approach,

---

[5] The Supreme Judicial Court has suggested that in making the difficult decision whether to admit or preclude evidence concerning a potential use, a judge can choose (i) to decline to admit the evidence or (ii) to admit it and provide a special question to the jury asking them to "find the fair market value of the taken property both under the existing use and under the potential use," with the option of granting a motion for judgment notwithstanding the verdict.  Boston Edison, 459 Mass. at 732 n.10.

its value could be enhanced by consideration of the range of uses that would potentially be allowed on the property. See id. at 400. The Commonwealth's insistence that the historical use of the property controls its value is misplaced.

Uses allowed in the EDA. Having determined that a reasonable buyer would have explored the uses to which the property could be put, we turn to the permitted uses in the EDA. We review the judge's decision on the admission of evidence of a potential use under the abuse of discretion standard. See Boston Edison, 459 Mass. at 732-733. Working with the plaintiffs' appraiser, the plaintiffs' expert engineer testified that the highest and best use was multiuse development including a hotel, manufacturing facility, warehouse, and retail. In its first motion in limine, the Commonwealth argued that the town's zoning by-law does not allow hotels, manufacturing uses, or warehouses in the EDA, and the judge expressly prohibited any evidence that the property could be put to those uses. The plaintiffs' engineering experts testified that hotel, manufacturing, and warehouse uses are allowed in the EDA with a special permit. The plaintiffs' experts further testified that where all of the requirements are met, as they would be here, special permits generally are granted.

Interpretation of a by-law is a question of law. Goldlust v. Board of Appeals of N. Andover, 27 Mass. App. Ct. 1183, 1184

(1989).  We discern no ambiguity in the town's zoning by-law.
Section 9.13 under article 9 specifically provides that the uses
within the EDA are governed by the pertinent regulations within
the S-1 district unless modified by the EDA in § 9.13.  The only
uses § 9.13 modifies are those permitted as of right by
expanding the list of "as of right" uses.  In delineating the
uses allowed as of right in the EDA, the by-law makes no mention
of the uses allowed by special permit in the S-1 district.  It
neither restricts nor expands them.  In the absence of anything
in the EDA that modifies the uses permitted with a special
permit in the S-1 district, at the time of the taking, the
plaintiffs were free to seek a special permit for those uses
allowed by special permit in the S-1 district.

     The Commonwealth suggests that to interpret the by-law the
way we do renders it redundant to specifically include "uses
permitted as of right in the [S-1 district]" in the list of uses
permitted as of right in the EDA.  We disagree.  By listing some
uses permitted as of right in the EDA and not addressing uses
already permitted as of right in the S-1 district, the by-law
could have been interpreted as having modified the uses
permitted as of right and having eliminated those not
specifically mentioned.  The drafters wisely prevented any such
ambiguity by specifically including uses permitted as of right

in the S-1 district in its list of uses permitted as of right in the EDA.

On appeal, the Commonwealth changes tack and argues that the judge prohibited evidence of potential hotel, warehouse, and manufacturing uses not because they were not allowed in the S-1 district, but because the plaintiffs had offered insufficient evidence that a special permit would have been granted. The Commonwealth did not make that argument to the trial judge. Where the judge did not explain his reasons for granting the Commonwealth's first motion in limine, we cannot infer that the judge granted the motion on grounds that were not argued to him. Although the Commonwealth cited to Skyline Homes in its first motion in limine, it did so in the context of its consistent position at trial and in arguing its motions in limine that hotel, warehouse, and manufacturing uses are prohibited on the plaintiffs' property because they are not contained in the list of uses allowed as of right in the EDA. So far as the record reflects, the Commonwealth did not agree that the uses are allowed with a special permit or argue that the plaintiffs had failed to show that a special permit, as opposed to a zoning change, probably would be granted. We note that in Skyline Homes, the Supreme Judicial Court referred to as "prohibited" a proposed highest and best use that under applicable zoning was allowed only with a special permit. Skyline Homes, 362 Mass. at

685, 687.  In that case, however, an application for a special permit for the proposed use had been denied in the past.  Id. at 688.  That is not the case here.

Moreover, even if the judge had in mind that the plaintiffs had to present evidence that a special permit probably would be granted, their expert testified that in his experience, special permits generally are granted where no waivers, or other zoning relief, are required.  Because, as the plaintiffs' plans showed, no waivers were required for the proposed special permit uses on their plans, the expert opined that the special permits likely would be granted.  With discounts for their futurity and likelihood, we think a reasonable buyer would have considered as significant the potential for development of special permit uses, including hotel, manufacturing, and warehouse uses, when determining the price the buyer was willing to pay.

In these circumstances, excluding from the jury's consideration any uses permitted by special permit in the EDA, including hotel, manufacturing, and warehouse uses, "unfairly precluded [the plaintiffs] from giving testimony bearing upon relevant aspects of value."  Aselbekian, 341 Mass. at 400 (citation omitted).  We are mindful that error in exclusion of evidence is ground for disturbing a judgment only where it has "injuriously affected the substantial rights of the parties."  G. L. c. 231, § 119, inserted by St. 1973, c. 1114, § 202.  See

Mass.R.Civ.P. 61, 365 Mass. 829 (1974). We disagree, however, with the Commonwealth's contention that any error in precluding evidence about the uses the property can support or how the property could be divided was not prejudicial because its expert testified that the property can be developed in the same way after the taking as before the taking. It is true that with the testimony of its own experts and in cross-examination of the plaintiffs' experts, the Commonwealth presented evidence that the property still had the same amount of frontage and could be developed in the same ways before and after the taking. As was said in Southwick v. Massachusetts Turnpike Authy., 339 Mass. 666, 670-671 (1959) (Southwick), however, "[t]he petitioner was entitled to bring out the relevant facts. If the reasons for his opinion could be shown on cross-examination (a) to be unconvincing, or (b) to result in an overestimate of the value of the property or of the feasibility of [the potential use], or (c) to be based on faulty analysis or inadequate investigation, these matters would go only to the weight of the testimony. They would not justify excluding the petitioner's testimony and reasons entirely." Without question, the excluded testimony impacted the credibility of the plaintiffs' engineering and appraisal experts' testimony. The ultimate determination of value was a question of fact for the jury who were entitled to

hear all relevant testimony as to how the property could be developed before making that determination.

Precluding the jury from considering all of the potential uses is enough to warrant a new trial.  Because the same issues may arise during any new trial, however, we comment briefly on the remaining issues.

Valuation of property.  Separate and apart from whether the property's development potential may be considered when determining the damages caused by the taking, the plaintiffs contend they should have been allowed to value the property on an individual lot basis.  On the record presented to him, the judge clearly was correct to exclude the individual lot method of appraisal.

The Supreme Judicial Court noted in Clifford v. Algonquin Gas Transmission Co., 413 Mass. 809 (1992) (Clifford), that in many jurisdictions, "[w]here the land is pure raw land, with no improvements at all having been made, but there was a showing of adaptability for subdivision purposes, valuation will generally be on a whole subdivision basis."  Id. at 816-817, quoting from 4 Nichols, Eminent Domain § 12.B.14[1][a], at 12B-127 (rev. 3d ed. 1990).  "The accepted rule is that the land will be considered in its present condition as a whole, with consideration given to any increment or enhancement in value due to the property's present adaptability to subdivision

development." Clifford, supra at 817. Other courts have allowed evidence of valuation based on the lot method of appraisal where there is "credible evidence of the costs of subdivision -- e.g., the expense of clearing and improving the land, surveying and dividing it into lots, advertising and selling, holding it, and paying taxes and interest until all lots are sold." Id. at 819, quoting from United States v. 47.3096 Acres, etc., in Oxford Township, Erie County, Ohio, 583 F.2d 270, 272 (6th Cir. 1978). Here, where any evidence of the developmental approach to value was prohibited before the plaintiffs' appraiser testified, we cannot know whether costs of development would have been factored in.

The court in Clifford noted that "no clear rule exists and that admissibility turns on the particular facts and the extent to which the development had progressed toward completion." Clifford, supra at 820. In Clifford, the court allowed evidence of valuation based on the lot method of appraisal where the taking prevented the completion of the second phase of development, which had already received preliminary approval and financing to begin construction. Id. at 820-821. We are unaware of a Massachusetts case, however, where the lot method of appraisal was allowed where, as here, no prior steps had been taken to divide the property. Repeatedly, the Supreme Judicial Court has stated that evidence of unrealized specific

development plans, rather than the effect upon market value of the general possibility of such a development, is inadmissible. See Southwick, 339 Mass. at 671; Aselbekian, 341 Mass. at 400-401; Clifford, supra at 814. See also Douglas Envtl. Assocs., Inc. v. Department of Envtl. Protection, 429 Mass. at 76, quoting from Skyline Homes, 362 Mass. at 686 ("Property must not . . . be valued as if a needed governmental approval were an accomplished fact. Rather, the trier of fact should consider possible uses not yet approved 'with discounts for the likelihood of their being realized and for their futurity'"). Although the plaintiffs contend the fact that they could have divided their property into ANR lots rather than lots requiring subdivision approval distinguishes this case, we are not convinced. Their plan included a two-lot subdivision in addition to three ANR lots, with the ANR lots having access issues due to steep topography. Creating the ANR lots was not in these circumstances a mere formality. Thus, although the potential for development and the range of uses that the property may support are relevant to ascertaining the value of the property and the effect of the taking, we do not go so far as to conclude that the property may be valued on an individual lot basis. So far as it appears from the record before us, the whole subdivision approach with appropriate consideration of the property's development potential is the proper measure of

damages. Should the evidence develop differently at any retrial, it will, of course, be open to the trial judge to consider anew whether a different method of valuation is appropriate.

Admission of development plans. On any retrial, it will be within the discretion of the trial judge whether to admit the plaintiffs' plans that were created for the sole purpose of demonstrating damages at trial. Evidence about the details of a "particular unexecuted project, . . . as distinguished from evidence about the contribution to the then existing market value" attributable to the possibility of development, is not admissible. Southwick, 339 Mass. at 669. See Clifford, 413 Mass. at 815, quoting from 4 Nichols, Eminent Domain, supra at § 12B.14[1], at 12B-126 (improbable developments or plats "hastily drawn up for the mere purposes of trial tactics" are inadmissible). Our cases reveal the dichotomy between precluding plans created for the purposes of litigation that are too detailed on the one hand and providing proof that uses claimed to be the highest and best use are "legally permissible, physically possible, and financially feasible" on the other. Boston Edison, 459 Mass. at 731 n.9. Here, the judge described the plans as detailed and sophisticated, and the Commonwealth contends they would mislead the jury into concluding that necessary approvals had been obtained for development. Were we

required to decide the issue, it is unlikely we could say the judge abused his discretion in precluding the plans.

We note, however, the difficult position the plaintiffs are in. In Aselbekian, the Massachusetts Turnpike Authority took approximately nineteen acres of the plaintiff's fifty-one acres, which historically had been operated as a dairy farm. Aselbekian, 341 Mass. at 399. At trial, there was testimony that the taking eliminated the usefulness of the property for a dairy farm and that the highest and best use would be for development into house lots. Id. at 399-400. An expert testified in some detail about the value of the property for this use and submitted a plan showing how the property could be developed into residential lots. Ibid. While noting that "[t]he plan, of course, had no proper place in this case except to illustrate the physical possibility that the land . . . could have been divided into [residential] lots," the Supreme Judicial Court concluded that the judge was within his discretion to admit it even though it was "a matter which . . . could have been stated with less risk of misleading the jury without use of a plan." Id. at 401. The Supreme Judicial Court commented that the judge, in his discretion, could reasonably have refused to admit the plan as an exhibit, while permitting it to be used as a chalk. Id. at 402.

While Aselbekian is instructive, explaining a residential subdivision to a jury is markedly different from explaining the range of uses allowed in the EDA, some of which would require sophisticated planning. Charged with introducing evidence that the property is amenable to uses that are permitted, physically possible, and financially feasible, it is difficult to conceive how the plaintiffs could have met their burden without the use of preliminary plans, at least as a chalk. Some level of detail was required to support their claim that the land could be developed for the proposed uses without the need for waivers and, therefore, special permits likely would be allowed. As the plaintiffs' counsel argued at trial, had the plans been less detailed, the Commonwealth would have argued that potential development for the proposed uses was speculative.

The plans showed where buildings could be placed and also showed that the plans, as drafted, would require no waivers. At any retrial, the judge will need to balance the need for the visual assistance to aid the jury's understanding with the risk of misleading the jury. It would seem that, at a minimum, clear labels on the plan and proper instructions reiterating the purpose of admission of the plans would be warranted should the plans be admitted into evidence. In addition, a view would go a long way toward eliminating the potential for confusion. See Clifford, 413 Mass. at 821 (where the jury were taken on a view,

they were "less likely to be confused as to the actual condition of the property when the expert testified concerning the proposed subdivision").  Whether specific plans will be admissible may be the proper subject for a pretrial motion in limine.

Pro tanto award.  The plaintiffs argue that the pro tanto award should have been admitted as evidence of the Commonwealth's assessment of damages in this case.  We agree with the Commonwealth that the pro tanto award is in essence a settlement offer and the judge did not err in declining to admit it in evidence.  The plaintiffs argue that it was unfair that the Commonwealth was able to cross-examine their expert with an earlier appraisal but that the plaintiffs were unable to so with the Commonwealth's initial valuation of damages.  It is not clear to us whether the plaintiffs made any effort to preclude admission of their earlier appraisal as work product or for other reasons.  We cannot say on this record that it was error to preclude the admission of the pro tanto award.

Judgment vacated.

Order denying motion for
new trial reversed.