BOSTON EDISON COMPANY *vs.* MASSACHUSETTS WATER
RESOURCES AUTHORITY.

Norfolk. November 2, 2010. - May 19, 2011.

Present: IRELAND, C.J., SPINA, COWIN, GANTS, & DUFFLY, JJ.[1]

*Eminent Domain,* Validity of taking, Damages. *Evidence,* Value, Expert opinion.
*Value. Damages,* Eminent domain, Interest. *Trust,* Public trust. *Department
of Environmental Protection. License. Administrative Law,* Agency's author-
ity, Regulations. *Office of Coastal Zone Management. Practice, Civil,*
Instructions to jury, Failure to make objection.

In an action brought by a utility under G. L. c. 79, § 12, to recover damages
caused by four eminent domain takings by the Massachusetts Water
Resources Authority (MWRA) on a certain site, the judge did not abuse his
considerable discretion in denying the MWRA's motion in limine to prohibit
the utility from admitting evidence and expert testimony in support of its
contention that a proposed residential development was the highest and
best use of the northern parcel on that site, where other evidence suggested
that a reasonable buyer would recognize the reasonable likelihood of the
potential use [730-733]; further, the judge acted within his discretion in
crediting the opinion of the utility's expert that there was a reasonable
likelihood that the town would allow rezoning of the northern parcel to
residential use [733-734]; finally, the judge did not exceed the range of his
discretion in ruling on the difficult evidentiary issue regarding the reason-
able likelihood that the northern parcel could be developed for residential
use even though it contained filled tidelands within a designated port area
[734-739].

In an action brought by a utility under G. L. c. 79, § 12, to recover damages
caused by four eminent domain takings by the Massachusetts Water
Resources Authority on a certain site, the judge did not err in limiting
damages on one parcel to those caused by the actual takings or the sewage
project for which the takings were made, where the utility made no objec-
tions at trial to the judge's instructions on this issue or to the special ques-
tions that reflected those instructions; and where the instructions were, at
any rate, proper. [739-741]

In an action brought by a utility under G. L. c. 79, § 12, to recover damages
caused by four eminent domain takings by the Massachusetts Water
Resources Authority on a certain site, the judge did not err in declining to
calculate interest on the entire award from the date of the first order of tak-
ing, or in applying the statutory rate under G. L. c. 79, § 37, as amended
through St. 2004, c. 352, §§ 35, 36. [741-744]

---

[1]Justice Cowin participated in the deliberation on this case prior to her
retirement.

CIVIL ACTION commenced in the Superior Court Department on August 6, 2002.

The case was tried before *John P. Connor, Jr.*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Mark S. Bourbeau (Jeffery A. Tocchio* with him) for the plaintiff.

*Diane C. Tillotson (Joseph L. Bierwirth* with her) for the defendant.

GANTS, J. Boston Edison Company (Boston Edison) brought this action under G. L. c. 79, § 12, to recover damages caused by four eminent domain takings by the Massachusetts Water Resources Authority (MWRA) on property known as the Fore River Station (site) in the town of Weymouth and city of Quincy. After a lengthy trial, the jury answered special questions and awarded damages of $8,100,000 for takings on the north parcel of the property (which lies north of Route 3A) and $2,900,000 for takings on the south parcel (which lies south of Route 3A). The parties cross-appealed from the judgment, and we granted the MWRA's application for direct appellate review.

*Background.* The site on the banks of the Fore River comprises 78.1 acres of land divided by Route 3A, all zoned for industrial use; there are 20.2 acres on the north parcel and 57.9 acres on the south parcel. In the 1920s, Boston Edison built a coal-fired electrical plant on the south parcel, which it converted to oil in the 1960s; it built oil storage facilities on the north parcel. Although Boston Edison decommissioned this plant in the late 1970s, it continued to run two turbines intermittently to cope with peak demand and maintained on the south parcel a "switch house" that transmitted power from the electrical grid into Quincy.

Under the deregulation of the energy industry accomplished by the electric utility industry restructuring act, St. 1997, c. 164, which became effective on November 25, 1997 (see *Shea* v. *Boston Edison Co.*, 431 Mass. 251, 252-258 [2000] [discussion of act]), Boston Edison could own either electrical generating facilities or transmission facilities, but not both. Boston Edison chose to retain its transmission facilities and sell its generating facilities. On December 10, 1997, as part of a broader agree-

ment to sell its generation facilities, Boston Edison entered into a purchase and sale agreement with Sithe Edgar LLC (Sithe) to sell the site, retaining a large easement on the south parcel that included the switch house.[2]

Schedule 3.10 of the agreement acknowledged that discussions had taken place with the MWRA over several years regarding the potential taking by eminent domain of a portion of the site for construction of a sewage pumping station and tunnel as part of the Braintree-Weymouth Sewer Relief Facilities Project (sewage project). The agreement noted that no formal taking had yet occurred, and no schedule for completion of the discussions had been established.

In April, 1998, prior to the closing, representatives of MWRA, Boston Edison, and Sithe met to discuss the anticipated takings for the MWRA's sewage project and Sithe's plans to construct a power plant on the site. All agreed that the site could accommodate both projects but that the sequencing and staging of construction, as well as the location of the structures, needed to be resolved. After a Sithe representative declared that Sithe could not place the new power plant on the south parcel because of the size and orientation of the site, a Boston Edison representative suggested that Boston Edison could move its switch house to a different location to enable Sithe to build on the south parcel. Under the closing agreement between Boston Edison and Sithe entered into on May 15, 1998, and a supplementary agreement entered into on October 29, 1999, Boston Edison agreed to transfer to Sithe much of the easement it had retained in the south parcel, including the part of the easement that contained the switch house, and to relocate the switch house to the smaller easement it retained on the south parcel. Sithe agreed to assign to Boston Edison its rights against the MWRA regarding the eminent domain takings on the site.[3]

MWRA's first order of taking, recorded on August 13, 1999,

---

[2]Sithe Edgar LLC is an affiliate of Sithe Energies, Inc., and Sithe New England Holdings LLC, and later changed its name to Exelon Edgar LLC (Sithe).

[3]The Massachusetts Water Resources Authority (MWRA) moved at trial to dismiss Boston Edison Company (Boston Edison) as a plaintiff on the ground that the assignment from Sithe did not give it standing to bring the takings claim. The MWRA raises this argument only in a footnote in its brief, so we

included an area of land in fee for a pumping station, a permanent drainage easement, two permanent subsurface and access easements, and three temporary easements to provide access to workers, machinery, and materials, and storage for construction materials and equipment, most of which were on the north parcel. A second and third order of taking recorded on February 20, 2001, and April 10, 2003, included permanent and temporary easements connected to the sewage project on the south parcel. Because of construction delays, the MWRA recorded a fourth order of taking on June 24, 2003, to extend by nine months the temporary access and storage easements on the north parcel specified in the first order of taking, which were originally set to expire on June 30, 2003.

At trial, Boston Edison contended that the highest and best use of the north parcel was as a mixed-use residential development that would include residential condominium units, a commuter boat terminal, a public marina, and a public waterfront park. Based on that highest and best use, its experts opined that the fair market value of the property interests taken on the north parcel was $11,400,000. The MWRA argued that it was not reasonably probable that the north parcel could be used for such a residential development because it was zoned for industrial use at the time of the first taking on August 13, 1999, and there was no reasonable probability that it would be rezoned for residential development.

In addition, the MWRA argued that, apart from the zoning restriction, the north parcel consisted of filled tidelands within a designated port area (DPA), as defined in 301 Code Mass. Regs. § 25.02 (1994), and a developer could not obtain a license from the Department of Environmental Protection (DEP) for the proposed residential project because it was within a DPA. The MWRA moved in limine before trial to bar all evidence and expert testimony regarding the proposed residential development, but the motion was denied. In answer to special questions, the jury found that it was "reasonably probable that the

consider it waived. "[A]rguments relegated to a footnote do not rise to the level of appellate argument." *Commonwealth* v. *Vick*, 454 Mass. 418, 433 n.15 (2009). See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975); *Electronic Data Sys. Corp.* v. *Attorney Gen.*, 454 Mass. 63, 65 n.5 (2009).

[n]orth [p]arcel could be rezoned for residential development notwithstanding that the property was zoned for industrial use as of August 13, 1999," and that it was "reasonably probable that the [n]orth [p]arcel could be developed for residential use notwithstanding that the property consisted of filled tidelands within a [DPA] as of August 13, 1999." The jury awarded Boston Edison $8,100,000 as damages arising from the takings on the north parcel.

As to the south parcel, Boston Edison argued that the takings and the sewage project caused the relocation of the switch house. Boston Edison maintained that it agreed to transfer to Sithe a substantial share of its retained easement and relocate its switch house because, based on the MWRA's plans for the taking in April, 1998, Sithe would otherwise have been unable to build its power plant on the site. This would have jeopardized not only the sale of the site but the sale of Boston Edison's other generating facilities to Sithe. Boston Edison, therefore, contended that the costs of relocating the switch house should be included as damages arising from the takings, and claimed damages in the amount of $11,820,000. Of this sum, $1,800,562 were direct damages arising from the takings on the south parcel, and $10,019,438 were damages arising from the relocation. The MWRA argued that the takings did not cause the relocation of the switch house, because its initial plans for the takings on the south parcel changed before the actual takings, in part to accommodate Sithe's construction of the power plant and Boston Edison's relocation of its switching facility. As a result of this change in plans, none of its permanent easements came close to the switch house, and none of its temporary easements touched it.

The judge instructed the jury that they may award damages "associated with the demolition and rebuilding of the switch house" if the jury found "that the switch house was relocated in anticipation of a taking *actually made* or the public project for which the taking was made" (emphasis added). In answer to a special question, the jury found that neither the takings nor the sewage project caused Boston Edison to relocate the switch house. The jury awarded $2,900,000 in damages for the takings on the south parcel.

After trial, Boston Edison moved under Mass. R. Civ. P. 59 (e), 365 Mass. 827 (1974), that interest be awarded on the

entire judgment from August 13, 1999, the date of recording of the first order of taking. Boston Edison also moved that damages bear interest at the "prudent investor" rate of fifteen per cent per annum rather than the statutory rate established in G. L. c. 79, § 37, because the statutory rate fell below the constitutional minimum, or, alternatively, that damages bear interest at a rate of 5.23 per cent for the first year after August 13, 1999, and at a rate of 6.17 per cent for each subsequent year. The judge denied the motion and awarded the rate of interest established in G. L. c. 79, § 37, commencing on the date of recording of each order of taking. Because the jury awarded damages for each parcel rather than each taking, the judge apportioned the damages among the four takings and calculated the interest based on that apportionment.[4]

The MWRA moved for judgment notwithstanding the verdict and for a new trial or, in the alternative, for remittitur. The judge denied the motion. After oral argument of the appeal, we directed the judge to provide us with a statement explaining his reasons for denying the remittitur as to the damage award regarding the south parcel and identifying the relevant evidence on which he relied. We also noted that the judge was "free, if he wishes, to reconsider his denial of the motion and to make any different or additional rulings that he deems appropriate." The judge, now with the benefit of the trial transcript, reconsidered and allowed the motion for remittitur, concluding that the damages awarded by the jury for the takings on the south parcel were excessive by $1,099,438, which was the difference between the jury's award for these takings ($2,900,000) and the amount of direct damages ($1,800,562) that Boston Edison's lone expert as to south parcel damages opined were caused by these takings. Boston Edison declined to remit the amount the judge found excessive and requested a new trial as to damages arising from the takings on the south parcel under Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974).[5]

---

[4]The judge, after deducting the pro tanto awards of $3,151,800, determined that $6,017,000 in damages arose from the first order of taking on August 13, 1999; $711,700 from the second order of taking on February 20, 2001; $897,000 from the third order of taking on April 10, 2003; and $222,500 from the fourth order of taking on June 24, 2003.

[5]The MWRA contends that, because the judge did not order a new trial as

*Discussion.* The parties raise three issues in the cross appeals.[6] First, the MWRA contends that the judge erred in denying its motion in limine to prohibit Boston Edison from admitting evidence and expert testimony in support of its contention that the proposed residential development was the highest and best use of the north parcel, and in denying the MWRA's motion for judgment notwithstanding the verdict as to the special question that asked whether it was reasonably probable that the north parcel could be developed for residential use even though it contained filled tidelands within a DPA. Second, Boston Edison claims that the judge erred in limiting damages on the south parcel to those caused by "actual takings" or the sewage project for which the takings were made, and by excluding evidence that Boston Edison reasonably relied on the MWRA's plans when it decided to demolish and move its switch house.[7] Third, Boston Edison argues that the judge erred in not awarding interest on the entire award from the date of the first order of taking, and in applying the statutory rate under G. L. c. 79, § 37, as amended through St. 2004, c. 352, §§ 35, 36.[8] We address each issue in turn.

1. *Reasonable probability of residential development on the*

___

an alternative to remittitur, Boston Edison is not entitled to a new trial as to damages arising from the takings on the south parcel. The judge has yet to decide whether to order a new trial or, if he were to order a new trial, the scope of the issues to be decided at that new trial. See G. L. c. 231, § 132 (if trial judge ordering new trial decides that "error affects part only of the matter in controversy . . . the [judge] may direct final judgment as to part thereof, . . . and may direct a new trial as to the other part only"); *Green* v. *Richmond,* 369 Mass. 47, 61 (1975), quoting *Simmons* v. *Fish,* 210 Mass. 563, 568 (1912) ("parties ought not to be compelled to try anew a question once disposed of by a decision against which no illegality can be shown").

[6]The MWRA raised a fourth issue on appeal, claiming that the judge abused his discretion in denying its motion for a new trial or, in the alternative, for remittitur, where the jury, having found that neither the takings nor the sewage project caused Boston Edison's relocation of the switch house, awarded damages on the south parcel beyond the range of the evidence, that is, above the highest opinion admitted in evidence. This argument was rendered moot by the judge's subsequent allowance of the MWRA's motion for remittitur.

[7]Boston Edison agrees that this issue remains ripe on appeal despite its declination of the remittitur and its request for a new trial, and has asked the judge to stay the new trial until we decide this issue.

[8]Boston Edison on appeal does not press its claim that the damage award should bear interest at the "prudent investor" interest rate of fifteen per cent.

*north parcel.* Where property is taken by eminent domain, the landowner is entitled to the fair market value of the property taken at the time of the recording of the order of taking, as well as "damages for all injury to the part not taken caused by the taking or by the public improvement for which the taking is made." G. L. c. 79, § 12. See *Aselbekian* v. *Massachusetts Turnpike Auth.*, 341 Mass. 398, 400 (1960) ("The measure of damages for the taking of land by eminent domain is the market value, at the time of the taking, of the land actually taken and the decline, attributable to the taking, in the market value of the owner's remaining land"). The fair market value of the property taken is the highest price that a hypothetical arm's-length willing buyer would pay to a hypothetical willing seller in a free and open market, based on the highest and best use of the property. See *Douglas Envtl. Assocs., Inc.* v. *Department of Envtl. Protection*, 429 Mass. 71, 75 (1999); *Epstein* v. *Boston Hous. Auth.*, 317 Mass. 297, 299 (1944), and cases cited.

Because the determination of fair market value is based on what a reasonable buyer would believe the property to be worth, the highest and best use of the property is not limited to the present use of the property but includes potential uses of land that a reasonable buyer would consider significant in deciding how much to pay. See *Skyline Homes, Inc.* v. *Commonwealth*, 362 Mass. 684, 686-687 (1972). Whether a potential use is reasonably likely in the foreseeable future is a matter that must be demonstrated by evidence, not guesswork or hypothesis.[9] See *id.* at 687; *Salem Country Club, Inc.* v. *Peabody Redevelopment Auth.*, 21 Mass. App. Ct. 433, 435 (1986). Where such evidence is absent, we consider the potential use too speculative to "figure materially" in the determination of a fair market price. *Skyline Homes, Inc.* v. *Commonwealth, supra.* See *Clifford* v. *Algonquin Gas Transmission Co.*, 413 Mass. 809, 814-815 (1992). Where potential uses are reasonably likely in the foreseeable future, we allow their consideration, but "with discounts for the likelihood of their being realized and for their futurity." *Skyline Homes, Inc.* v. *Commonwealth, supra* at 686. See *Douglas Envtl. Assocs., Inc.* v. *Department of Envtl. Protection, supra* at 76 ("fact that

---

[9]As one of Boston Edison's experts testified at trial, a potential highest and best use must be legally permissible, physically possible, and financially feasible.

a potential use is prohibited or restricted by law at the time of the taking does not preclude its consideration if there was a reasonable prospect of rezoning or acquiring a special permit").

A judge has "a range of discretion" in deciding whether to admit evidence that a potential use is reasonably likely in the foreseeable future, which may depend on whether rezoning or the grant of a license or special permit is reasonably likely. *D'Annolfo* v. *Stoneham Hous. Auth.*, 375 Mass. 650, 656 (1978). See *Roach* v. *Newton Redevelopment Auth.*, 381 Mass. 135, 136-137 (1980); *Skyline Homes, Inc.* v. *Commonwealth, supra* at 687-688. "The problem of the trial judge is to avoid unreasonably restricting the efforts of the owner fairly to show the effect of the taking upon the market value of the affected property at the time of the taking . . . without permitting damages to be inflated by unduly detailed and confusing proof of speculative future uses of property having no very direct relationship to market values at the time of the taking." *Aselbekian* v. *Massachusetts Turnpike Auth., supra* at 401. "An opinion of value founded on such a use has been held properly admissible where, 'upon all the evidence in the case, the jury could warrantably find that a willing buyer's evaluation of the land could be influenced by the possibility of a change in zoning.' " *D'Annolfo* v. *Stoneham Hous. Auth., supra*, quoting *Lee* v. *Commonwealth*, 361 Mass. 864, 865 (1972).[10] Therefore, we review the judge's admission of evidence regarding the potential use of the north

___

[10]A judge who struggles with a difficult question regarding the admissibility of evidence concerning a potential use of land has two options. He can allow or deny the admission of the evidence, based on whether a reasonable jury relying on the evidence could conclude that the potential use is reasonably likely in the foreseeable future. Or he can admit the evidence, even where he doubts its admissibility, and provide special questions to the jury asking them to find the fair market value of the taken property both under the existing use and under the potential use, if they find the potential use to be reasonably likely in the foreseeable future. The judge can then grant judgment notwithstanding the verdict if he concludes that the evidence does not support the jury's finding as to the potential use, and enter judgment based on the fair market value found by the jury under the existing use. See *D'Annolfo* v. *Stoneham Hous. Auth.*, 375 Mass. 650, 652 (1978) (judge "did this to avoid the necessity of a new trial, if an appellate court should determine that it was error to disregard the plaintiffs' evidence of value based on a reasonable prospect of a zoning change"). The judge adopted the first option here, and did not ask the jury to find the fair market value of the taken property based on the existing industrial use of the property.

parcel as a mixed-use residential development under the abuse of discretion standard. We conclude that there was no abuse of the judge's considerable discretion.

The MWRA claims that the judge abused his discretion in admitting this evidence for three reasons. First, it contends that the potential use must be "imminent" to be considered in determining fair market value, and there was no evidence that Boston Edison or Sithe had taken any steps toward a mixed-use residential development on the north parcel. Evidence of a potential use, even a reasonably likely one, may not be admitted in evidence unless it is sufficiently imminent to be taken into account by a reasonable prospective buyer in determining a property's price. See *Skyline Homes, Inc.* v. *Commonwealth, supra* at 687; *Aselbekian* v. *Massachusetts Turnpike Auth., supra* at 400-401. But a property owner need not have taken recent steps to develop a property to its highest and best potential use in order for a reasonable buyer to recognize the likelihood that the property can be put to that use in the foreseeable future, discounting the property's value in view of the risk that a future potential use might be thwarted and that the profits from the potential use will be earned in future dollars. See *id.* at 399, 401 (potential residential development on dairy farm admissible even though such development's "imminence . . . was not too great," plans "somewhat informal," and project was not in progress). While a judge may infer that a property owner's failure to develop the property in accordance with what the property owner now claims to be its best and highest use suggests that the potential use was not reasonably likely, a judge is not bound to that inference where, as here, other evidence suggests that a reasonable buyer would recognize the reasonable likelihood of the potential use.

Second, the MWRA contends there was no reasonable likelihood that the property would be rezoned from industrial to residential use. The judge acted within his discretion in crediting the opinion of Boston Edison's expert, Martin J. Coleman, Jr., that there is a reasonable likelihood that the town of Weymouth would allow rezoning of the north parcel to residential use. See *Standish Mgt., Inc.* v. *Randolph Hous. Auth.*, 26 Mass. App. Ct. 901 (1988); *Keating* v. *Duxbury Hous. Auth.*, 11 Mass.

App. Ct. 934 (1981). Coleman testified that, from 1971 to 1990, over sixty parcels in Weymouth were rezoned from industrial to residential use, and that, from 1991 to 2005, another 128 parcels or lots were similarly rezoned. Coleman also testified that several master plans and studies had accepted the principle that Weymouth was primarily a residential town, and that a 1988 master plan had recognized that the north parcel provided an excellent opportunity for recreational uses connected to the waterfront that were compatible with residential development. Coleman also testified to the recent history of rezoning from commercial to residential use of comparable waterfront properties along the southeast coast of Massachusetts, noting that the last commercial building erected along this section of coastline was built approximately forty years ago. See *Skyline Homes, Inc.* v. *Commonwealth, supra* at 688 (citing cases where zoning approval shown to be reasonably likely). See also *Roach* v. *Newton Redevelopment Auth.*, 381 Mass. 135, 136-137 (1980).

Third, the MWRA argues that there was no reasonable likelihood that the proposed mixed-use residential development could be built on the north parcel because the DEP would not issue the license required to build on these private filled tidelands under the governing regulations.[11] The judge did not address this issue in denying the MWRA's initial motion in limine, but addressed it briefly in denying the MWRA's renewed motion. The judge acknowledged that filled private tidelands are regulated by DEP under G. L. c. 91, but noted that DEP has the authority to approve nonwater-dependent uses that it determines "serve[] a public purpose." He also noted that the Legislature has the power to relinquish the Commonwealth's interest in certain filled tidelands. He found that there is a reasonable probability that either DEP or the Legislature will take action that will allow residential use of the north parcel, and that such action is

---

[11]General Laws c. 91, § 1, defines "[t]idelands" as "present and former submerged lands and tidal flats lying below the mean high water mark." "Private tidelands" are "tidelands held by a private party subject to an easement of the public for the purposes of navigation and free fishing and fowling and of passing freely over and through the water." The tidelands on the north parcel, having long ago been filled, are now "[f]illed tidelands," which are "former submerged lands and tidal flats which are no longer subject to tidal action due to the presence of fill." 310 Code Mass. Regs. § 9.02 (2000).

not precluded by the designation of the property as a DPA by the Office of Coastal Zone Management (CZM). Recognizing the question to be close, we conclude that the judge did not exceed the "range of discretion" we give to trial judges in ruling on these difficult evidentiary issues. See *D'Annolfo* v. *Stoneham Hous. Auth.*, 375 Mass. 650, 656 (1978).

The judge correctly described the authority of the Legislature and DEP. We declared in *Moot* v. *Department of Envtl. Protection*, 448 Mass. 340, 342-343 (2007), *S.C.*, 456 Mass. 309 (2010):

> "General Laws c. 91 governs, among other things, water- and nonwater-dependent development in tidelands and the public's right to use those lands. . . . Under the public trust doctrine, the Commonwealth holds tidelands in trust for the use of the public for, traditionally, fishing, fowling, and navigation. *Fafard* v. *Conservation Comm'n of Barnstable*, 432 Mass. 194, 198 (2000), and cases cited. To the extent that nonwater-dependent use — that is, nontraditional use — is to be made of tidelands, the Legislature has now expressly mandated that any such nonwater-dependent use '*shall* serve a proper public purpose.' See G. L. c. 91, § 18, as amended by St. 1983, c. 589, § 26.[12]

> "The obligation to preserve the public trust and to protect the public's interest . . . has been delegated by the Legislature to the department, which, as charged in G. L. c. 91, § 2, 'shall act to preserve and protect the rights in tidelands of the inhabitants of the commonwealth by ensuring that the tidelands are utilized only for water-dependent uses *or otherwise serve a proper public purpose*' " (emphasis in original).

The Legislature also retains the authority to relinquish or extinguish the public's rights in tidelands by express legislative authorization. See *id.* at 347; *Trio Algarvio, Inc.* v. *Commissioner of the Dep't of Envtl. Protection*, 440 Mass. 94, 97 (2003).

---

[12]We noted in *Moot* v. *Department of Envtl. Protection*, 448 Mass. 340, 342 n.5 (2007), *S.C.*, 456 Mass. 309 (2010), that G. L. c. 91, § 18, "does not define 'proper public purpose,' but a 'proper public purpose' should not be confused with preserving the public's rights in tidelands. Extinguishing the public's right in filled or landlocked tidelands might constitute a proper public purpose."

Under G. L. c. 91, § 18, "[n]o structures . . . for nonwater
dependent uses of tidelands . . . may be licensed unless a writ-
ten determination by the department is made following a public
hearing that said structures . . . shall serve a proper public
purpose and that said purpose shall provide a greater public
benefit than public detriment to the rights of the public in said
lands and that the determination is consistent with the policies
of the Massachusetts coastal zone management program." This
last phrase refers to a program, directed by the Secretary of the
Executive Office of Environmental Affairs (Secretary) through
the CZM, whose purpose is to extend to Massachusetts residents
the "objectives and benefits of the Federal Coastal Zone Man-
agement Act, [16 U.S.C. §§ 1451 et seq.]" G. L. c. 21A, § 4A.
To carry out this purpose, CZM has promulgated regulations
governing the primary working waterfronts within Massachusetts's
developed coastal harbors, known as the DPA regulations. The
declared objective of the DPA regulations is:

> "within DPAs . . . to encourage water-dependent industrial
> use and to prohibit, on tidelands subject to the jurisdiction
> of [G. L. c. 91], other uses except for compatible public
> access and certain industrial, commercial, and transporta-
> tion activities that can occur on an interim basis without
> significant detriment to the capacity of DPAs to accom-
> modate water-dependent industrial use in the future."

301 Code Mass. Regs. § 25.01(2) (1994).

Under the DEP regulations, any applicant for a license for a
nonwater-dependent use project must send notice of its license
application to the CZM if the project is located within a coastal
zone. See 310 Code Mass. Regs. § 9.13(1)(a)(4) (2008). If the
CZM notifies the DEP that it intends to participate in license
proceedings, the CZM must prepare a written statement as to
whether the project is consistent with the policies of the coastal
zone management program before any issuance of a license.
310 Code Mass. Regs § 9.13(2)(a) (2008).[13] Where the DEP
concurs with the CZM's conclusions and recommendations, the

---

[13]The Department of Environmental Protection (DEP) "shall presume that a
project is consistent with [Office of Coastal Zone Management (CZM)] poli-
cies . . . unless [CZM . . . submits a notice of its intent to participate and

CZM's written statement shall be adopted as part of DEP's written determination on the license application. 310 Code Mass. Regs. § 9.54(1) (2008). Where it disagrees, and the Secretary is unable to resolve the disagreement, DEP "shall include in the written determination an explanation of the specific basis for its final decision on consistency with CZM policies." 310 Code Mass. Regs. § 9.54(2) (2008).

The DEP declares in its regulations that a nonwater-dependent use project on tidelands within a DPA shall be eligible for a license only if it accommodates one of the following uses on a limited basis: a use to be licensed in combination with water-dependent industrial uses within a marine industrial park, a temporary use, or "a supporting DPA use, as defined in 310 [Code Mass. Regs. §] 9.02." 310 Code Mass. Regs. § 9.32(1)(b)(4) (2008).[14]

In deciding the motion in limine, the judge considered an affidavit from Boston Edison's expert, Charles J. Natale, Jr., who formerly served as chief of the DEP's c. 91 waterways licensing program. Natale declared that the definition of "supporting DPA use" did not "explicitly exclude residential uses," and he provided examples where DEP licenses had been issued for "non-water dependent, non-industrial uses of filled tidelands" that included residential use. He also declared that 310 Code Mass. Regs. § 9.36(5) (1994) reaffirmed the CZM's policy of

---

written comments during the public comment period]." 310 Code Mass. Regs. § 9.13(2)(a) (2008).

[14]"Supporting DPA [designated port area] Use means an industrial or commercial use in a [DPA] that provides water-dependent industrial use in the DPA with direct economic or operational support, to an extent that adequately compensates for the reduced amount of tidelands on the project site that will be available for water-dependent industrial use during the term of the license. The type, location, scale, duration, operation, and other relevant aspects of the industrial or commercial use must be compatible with activities characteristic of a working waterfront and its backlands, in order to preserve in the long run the predominantly industrial character of the DPA and its viability for maritime development. . . . In the case of commercial uses, any use may be determined to be compatible with the DPA except where the inherent nature of the use gives rise to severe conflict with port operations or excessive consumption of port space, either directly or indirectly (e.g. as a result of collateral development activity). Accordingly, new or expanded uses that shall not be determined to be a Supporting DPA Use include, but are not limited to, transient group quarters such as hotels/motels, nursing homes, and hospitals; recreational boating facilities . . . ." 310 Code Mass. Regs. § 9.02 (1994).

"flexible protectionism" for supporting uses in DPAs by allow-
ing licensing consideration "where there is reasonable evidence,
or municipal planning initiatives, which suggest [that] preserv-
ing these waterfront areas for future water-dependent industrial
uses [would be] either impractical or unlikely."[15] At trial, he
testified that, in reviewing license applications for nonwater-
dependent uses in DPAs, the DEP first determines whether there
is a bona fide industrial use that has expressed an interest in us-
ing the site. If there is, the DEP will yield to that marine industrial
use, but if there is not a competing interest, "it then can consider
other nonmarine industrial uses for . . . that property." Because
there was no bona fide industrial use likely to be interested in
the north parcel site, he opined that it was reasonably probable
that the DEP would issue a license for the proposed residential
project.

At trial, another Boston Edison expert, Gregor I. McGregor,
testified that if a licensing application for the project ran into
trouble because it was located within a DPA, there was a reason-
able likelihood that the CZM would remove the property from
the DPA through a "boundary review." Under 301 Code Mass.
Regs. § 25.03(1) (1994), a property owner within a DPA may
request the CZM to review whether the property should continue
to remain within the boundaries of the DPA.[16] An area of land
"shall be included or remain in a DPA if and only if CZM finds
that the area is in substantial conformance with . . . criteria
governing suitability to accommodate water-dependent industrial
use, as appropriate to the harbor in question," with one criterion
being that "the land area must exhibit a use character that is

[15]Under 310 Code Mass. Regs. § 9.36(5)(a) (1994), a project shall not oc-
cupy tidelands that DEP determines "are necessary to accommodate a competing
party who intends to develop such tidelands for water-dependent industrial
use."

[16]An area is not eligible for such a boundary review if it is a "land area
within a DPA that is entirely bounded by existing DPA lands and/or by any
waters." 301 Code Mass. Regs. § 25.03(2)(d) (1994). On cross-examination,
Boston Edison's expert, Charles J. Natale, Jr., admitted that the north parcel is
surrounded on three sides by water and on the fourth side by other land in the
DPA, but on redirect examination he testified that it was bounded on one side
by residential property that was outside the DPA. Therefore, there was evidence
at trial that the owner of the north parcel was eligible for a DPA boundary
review.

predominantly industrial, or reasonably capable of becoming so because it does not contain a dense concentration of (1) non-industrial buildings that cannot be removed or converted, with relative ease, to industrial use; or (2) residential, commercial, recreational, or other uses that unavoidably would be destabilized if commingled with industrial activity." 301 Code Mass. Regs. § 25.04(2)(d) (1994).[17] In view of the testimony that there was no realistic prospect of the north parcel being developed for industrial use, the judge was entitled to credit this opinion regarding the likely outcome of a DPA boundary review.

There was also evidence that, on three occasions, the Legislature had acted directly to remove property from a DPA. While the judge did not permit any expert to offer an opinion whether it was reasonably probable that the Legislature would remove the north parcel from the DPA, this possibility may also be considered in weighing the calculation of probability.

We recognize that reasonable minds may differ as to whether the projects that Boston Edison's experts described where DEP had issued c. 91 licenses were comparable to the project that was proposed in this case, and as to whether the staff of DEP and CZM today would interpret their regulations as flexibly as Boston Edison's experts suggested they had in the past. But, because a reasonable mind may credit this testimony, we conclude that the judge did not abuse his considerable discretion in admitting it. We also conclude that the judge did not err in denying the MWRA's motion for judgment notwithstanding the verdict as to the special questions regarding reasonable probability. A rational jury, viewing the evidence in the light most favorable to Boston Edison, reasonably could have found that it was reasonably probable that the north parcel could be rezoned for residential use and developed even though it was in a DPA.

2. *Limiting damages on the south parcel to those caused by the actual taking or the public project for which the taking was made.* The jury in answer to a special question found that "the takings by the MWRA, or the [sewage project] for which the

---

[17]At trial, two of the MWRA's experts, Pamela McKinney, a real estate appraiser, and Dennis W. Ducsik, CZM's tidelands policy coordinator, admitted on cross-examination that residential development had occurred in lands formerly designated as DPAs.

takings were made," did not cause the demolition and replacement of Boston Edison's switch house and related transmission facilities. Boston Edison now claims that the judge erred in limiting damages to those caused by the taking or the sewage project for which the takings were made. Boston Edison argues that the judge should have permitted the jury to award damages if Boston Edison relocated the switch house in reasonable reliance on MWRA's earlier plans for a taking, even though the MWRA later revised those plans so that the actual takings steered clear of the switch house. The judge did not err.

There are two flaws with Boston Edison's argument, each fatal. First, Boston Edison did not object at trial to the judge's instructions on this issue or to the special questions that reflected those instructions. Having failed to object at trial, it waives its right to claim error on appeal. Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974) ("No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection"). See *Flood* v. *Southland Corp.*, 416 Mass. 62, 66-67 (1993).

Second, even if Boston Edison had preserved its rights through an objection, the instruction was not error because a property owner is only entitled to damages caused by an actual taking or by the public improvement for which the taking is made; the owner is not entitled to damages caused by plans for a taking that the government does not carry out. See G. L. c. 79, § 12; *Cayon* v. *Chicopee*, 360 Mass. 606, 608 (1971) (landowner has no right to damages where there has been no taking); *Swampscott* v. *Remis*, 350 Mass. 523, 524-525, 526-527 (1966) (neither "enactment of legislation authorizing the condemnation of property" nor "the filing of a petition" entitles owner to compensation). See also *Roman Catholic Bishop of Springfield* v. *Commonwealth*, 378 Mass. 381, 387 (1979) (line separating those persons who do and those who do not recover for damages resulting from a public improvement "has been fixed by the Legislature on the basis of whether any part of their land has been taken for the project"). Therefore, where a redevelopment authority publicly announced the seizure of a particular property by eminent domain for an urban redevelopment area

but failed to execute the taking, we held that the property owner was not entitled to damages because there had been no taking. See *Cayon* v. *Chicopee, supra* at 609-612.[18]

The fact that there later was a taking, albeit one far different from the one earlier planned, does not alter the principle that damages arising from a planned taking are not compensable. The only difference is that damages arising from the actual taking or from the public improvement for which the taking was made are compensable, and the jury must distinguish between damages arising from the actual taking and those arising from the planned, but unrealized, taking.

3. *The calculation of interest.* Under G. L. c. 79, § 37, damages in eminent domain proceedings "shall bear interest at the rate calculated pursuant to the provisions of this section from the date on which the right to damages under this chapter vested until paid." The right to damages in an eminent domain taking vests on the recording of an order of taking. G. L. c. 79, § 3 ("Upon the recording of an order of taking . . . title to the fee of the property taken . . . shall vest in the body politic or corporate on behalf of which the taking was made; and the right to damages for such taking shall thereupon vest in the persons entitled thereto . . ."). Because the right to damages vests on the recording of an order of taking, and the owner's entitlement to interest begins from the date of vesting, interest on eminent domain damages begins to accrue from the date of recording of the order of taking. See *Swampscott* v. *Remis, supra* at 527 ("In this Commonwealth the point in time when interest commences to accrue for nonpayment has been fixed at the formal taking or vesting of title").

---

[18]In *Cayon* v. *Chicopee*, 360 Mass. 606, 612 (1971), we noted that "[t]o hold that such public announcements, even where they result in a decrease in property values, amount to a compensable taking would frustrate the purposes sought to be achieved by requiring disclosure and would hamper the orderly procedures to be followed in redeveloping blighted areas of the community." A comparable unfortunate consequence would arise here if Boston Edison were to prevail, because the MWRA shared its plans with Boston Edison and Sithe to diminish needless confusion and cost arising from the various projects being conducted simultaneously on the site, and ultimately delayed part of the sewer project to avoid interfering with the construction of Sithe's power plant. If a government risked increasing its exposure to eminent domain damages as a consequence of communicating its plans, it might choose to remain silent until the time of the actual taking — to the detriment of all parties involved.

The judge, therefore, correctly recognized that the judgment needed to state the amount of damages caused by each of the four orders of taking in order to calculate prejudgment interest. Because the special questions did not ask the jury to award damages for each order of taking, the judge exercised his authority to make findings allocating the jury's damage award for the north and south parcels among the four orders of taking. See Mass. R. Civ. P. 49 (a), 365 Mass. 812 (1974) (where judge omits issue of fact in special verdict and parties fail to demand submission, parties waive right to trial by jury of omitted issue and judge may make finding).[19]

Boston Edison contends that the judge should have calculated interest for the entirety of damages from the date of the first order of taking. Boston Edison's argument conflates the calculation of prejudgment interest with the calculation of damages. Under G. L. c. 79, § 12, "damages for property taken . . . shall be fixed at the value thereof before the recording of the order of taking." Fixing the valuation of damages before the taking reflects the principle that, where the fair market value of the property taken is the measure of damages, the value should not be affected, positively or negatively, by the eminent domain action. See *Lipinski* v. *Lynn Redevelopment Auth.*, 355 Mass. 550, 553-554 (1969); *Alden* v. *Commonwealth*, 351 Mass. 83, 86-87 (1966). Where there is a series of takings to accomplish a public works project, and the subsequent takings are foreseeable after the first taking, this principle requires the valuation of damages "before the beginning of the entire public work which necessitates the taking." *Lipinski* v. *Lynn Redevelopment Auth.*, *supra* at 553, quoting *Connor* v. *Metropolitan Dist. Water Supply Comm'n*, 314 Mass. 33, 40 (1943). The principle that the taking itself should not affect the valuation of damages, however, does not require that interest be calculated from the date of the first taking. The principle governing the payment of interest is quite different — interest becomes due only when the owner transfers title and becomes entitled to the fair market value of

---

[19]No party contends that the judge's allocation of damages was clearly erroneous, and we conclude that it was not clearly erroneous.

the property forcibly transferred.[20] That principle would be violated if Boston Edison were entitled to interest on the valuation of its property during a period of time when it still held title to that property.

Boston Edison also claims entitlement to the interest calculation in G. L. c. 79, § 37, as amended through St. 1993, c. 110, §§ 136, 137, contending that the Legislature may not reduce the rate of interest in eminent domain actions.[21] We acknowledge the "general rule [that] statutes operate prospectively unless a contrary legislative intent is clearly shown." *Verrochi* v. *Commonwealth*, 394 Mass. 633, 638 (1985), quoting *Nantucket Conservation Found., Inc.* v. *Russell Mgt., Inc.*, 380 Mass. 212, 214 (1980). But the Legislature made its contrary intent plain in amending § 37 when it declared that the amended statute "shall apply to those pending cases in which no final judgment has entered as of the effective date of this act." St. 2004, c. 352, § 178. Therefore, under the statute, the calculation of interest in

---

[20]This principle is still best exemplified by the words of Chief Justice Shaw in an eminent domain case in 1834:

> "The true rule would be, as in the case of other purchases, that the price is due and ought to be paid, at the moment the purchase is made, when credit is not specially agreed on. And if a pie-powder court could be called on the instant and on the spot, the true rule of justice for the public would be, to pay the compensation with one hand, whilst they apply the axe with the other; and this rule is departed from only because some time is necessary, by the forms of law, to conduct the inquiry; and this delay must be compensated by interest."

*Parks* v. *Boston*, 15 Pick. 198, 208 (1834).

[21]General Laws c. 79, § 37, as amended through St. 2004, c. 352, § 36, provides that, where the period for which prejudgment interest is owed is more than one year, interest for the first year "shall be calculated at an annual rate equal to the weekly average one-year constant maturity treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date on which the right to damages under this chapter vested," and for additional years "shall be calculated on the principal amount due at an annual rate equal to the weekly average one-year constant maturity treasury yield . . . for the calendar week preceding the beginning of each additional year." Statute 1993, c. 110, § 137, provided that interest "shall be at an annual rate equal to the coupon issue yield equivalent, as determined by the Secretary of the Treasury, of the average accepted auction price for the last auction of 52-week United States Treasury bills settled immediately before the date of taking; provided, however, that such interest shall not exceed the rate of ten percent per annum."

the amended statute applies to this judgment. Because Boston Edison has waived any constitutional challenge to the statutory rate of interest, we fail to see what basis remains for claiming the preamendment rate of interest.[22] We discern no error in the calculation of prejudgment or postjudgment interest.

*Conclusion.* We affirm the judge's rulings as to the three issues raised on appeal and remand the case to the Superior Court for further action consistent with this opinion and the judge's allowance of the motion for remittitur.

*So ordered.*

---

[22]Boston Edison cites *Verrochi* v. *Commonwealth*, 394 Mass. 633 (1985), in support of its argument. We concluded in the *Verrochi* case that the interest rate in the amended statute should be used to calculate the rate of interest even though the Legislature failed to state that the amended rate applied to all pending cases, because the Legislature amended the statute to cure constitutional concerns as to the adequacy of the rate of interest in the earlier statute and, therefore, intended the amended rate to apply to pending cases. *Id.* at 641-642. Nothing in that case supports the contention that the Legislature may raise interest rates in pending cases, but not lower them. Nor does the record provide a factual basis to support Boston Edison's argument that the calculation of interest under the amended statute yields a lower interest rate than under the earlier version.