Fishman, Kenneth J., J.
The three cases before the court are petitions for damages, which arose after the Somerville Redevelopment Authority (“SRA”) took certain property by eminent domain on May 29, 2013, in an effort to revitalize Somerville in connection to the expansion of the MBTA’s Green Line at Union Square. At the time of the takings, plaintiff Francis Fahey maintained a residence and business at 26-30 Prospect Street, Somerville, Massachusetts, and plaintiff Prospect Iron & Steel Corp. and affiliated corporations (“Prospect Iron”) maintained businesses at 40 Bennett Street also in Somerville. In addition, defendant and cross claimant Antonia Shelzi owned a two-story, single-family residence at 4 Milk Place in Somerville, upon which plaintiff Deutsche Bank National Trust Co. (“Deutsche Bank”) was a mortgagee (hereinafter, the “subject properties” or the “properties”).
After the takings, the SRA made pro tanto offers in the amount of $385,000.00 to Fahey, $3,165,000.00 to Prospect Iron, and $75,000.00 to Deutsche Bank’s mortgage servicer, by way of its mortgage instrument with Shelzi. Subsequently, the plaintiffs instituted these actions contending that such offers were not just and reasonable compensation as required by the Fifth Amendment to the U.S. Constitution and art. 10 of the Massachusetts Declaration of Rights.
The matters are presently before this Court on the SRA’s motions for partial summary judgment in each case. The gravamen of the SRA’s argument is that the opposing parties are not entitled to increases in the properties’ values, which the SRA avers are attribut *582 able to the announcement of the revitalization project. Additionally, the SRA argues that the changes in zoning, which were enacted prior to the taking but in furtherance of the revitalization project, should similarly be excluded from the just compensation calculation. After hearing, and upon review and consideration, the motion is DENIED.
BACKGROUND
The following relevant, undisputed facts are taken from the summary judgment record, with certain additional facts reserved for later discussion.
Revitalization of this project area in Somerville (or “the city”) began as early as February 1988, when the city published the Boynton Yards Revitalization Plan (“Boynton Yards Plan”).[4] Boynton Yards was an 80-acre site adjacent to Union Square, which consisted of industrial, commercial, and residential uses. However, the area suffered from blight, decadent, and substandard conditions, as defined in G.L.c. 12IB. The Boynton Yards Plan aimed at redeveloping this area to eliminate such conditions while also creating newjobs and affordable housing opportunities. The Boynton Yards Plan was a two-phase plan, and the first phase was completed on June 22, 2006. The SRA concedes that the second phase was abandoned when the city chose to expand its plans for redevelopment into Union Square.[5]
In the spring of 2000, Somerville initiated various planning studies, including the Union Square Revitalization Study. The outcome of that study was the Union Square Revitalization Study Neighborhood Revitalization Strategy Area Plan (“NRSA Plan”), which the city published in the spring of 2002.[6] The NRSA Plan targeted low and moderate income areas for economic development and granted the city access to public funds made available through the U.S. Department of Housing and Urban Development (“HUD”). Maps contained in the NRSA Plan denoted the boundary lines of the strategy area, which included a portion of Union Square.
Subsequently, in April 2003, Somerville published the Five-Year Consolidated Plan (“2003 Consolidated Plan”), which was written in accordance with HUD requirements to gain access to federal funding. The 2003 Consolidated Plan provided the framework for disbursing those funds to various programs throughout the city. It also commented on the potential for expanding the Green Line to Union Square, noting “[s]ome land assembly may be required by private developers, the MBTA, or the City of Somerville/Som-erville Redevelopment Authority in order to facilitate development.” (Emphasis added.)
That same month, Somerville published the Union Square Master Plan[7] (“Master Plan” or “2003 Master Plan”), which incorporated the goals and objectives of the second phase of the Boynton Yards Plan and the 2003 Consolidated Plan and established a timeline to accomplish those initiatives. Phase I of the Master Plan was simply the 2003 Consolidated Plan. Phase II consisted of ideas unique to the Master Plan, which “identifiefd] new opportunities, [wove] together previously-identified recommendations into a cohesive vision, and then define[d] a step-by-step Action Agenda.” The Master Plan also acknowledged that Somerville was in the process of negotiating with the MBTA to implement “new rapid transit services for Somerville as a whole and Union Square in particular,” and it named Prospect Street (a/k/a “Prospect Street Corridor” or “Prospect Street Gateway”) as the potential location for the transit station.[8] In addition, the plan predicted that land values and pressures to build in the Prospect Street area would increase, pending commitments for transit funding.[9] The Master Plan also contemplated that the MBTA would acquire easements through the area but stated, “(s]ite assembly may be required as well.” (Emphasis added).
The Master Plan also envisioned new zoning initiatives to incentivize redevelopment. More specifically, the plan stated, “[with] major redevelopment... likely to occur in the Prospect Street corridor as transit commitments . . . are confirmed ... a zoning district boundary change should be considered to extend the CBD [a/k/a Central Business District] to the eastern side of Prospect Street” (see Ex. 9, p. 29), because the CBD zoning provisions were supportive of this new type of development. In addition, the Master Plan proposed a Transit Overlay District within 1,200 to 1,500 feet of the proposed transit station location, which would reduce the mandated parking ratios below those already required for entertainment uses. The Master Plan suggested that these zoning changes occur in 2009.
In 2008, Somerville initiated a study to determine whether the Somerville Zoning Ordinance in Union Square should be amended. A public hearing was held on December 4, 2008, and on April 23, 2009, the Board of Aldermen adopted Ordinance No. 2009-03 (“Zoning Amendment” or “2009 Zoning Amendment”). The Zoning Amendment acknowledged that it was “in the City’s best interest to take advantage of anticipated Federal and State investment in the extension of the Green Line . . .” (Emphasis added.)
On April 19, 2012, Somerville’s Board of Aldermen endorsed the SomerVision Comprehensive Plan 2010-2030 (“SomerVision"), pursuant to G.L.c. 41, §81D, which qualified it as a “Master Plan.”[10] SomerVision’s goals and objectives not only included transforming Union Square, but also expressed a commitment to undertake redevelopment in the city as a whole.
On October 2, 2012, Somerville approved the Union Square Revitalization Plan (“Revitalization Plan” or “2012 Revitalization Plan”),[11] which is a twenty-year urban renewal plan.[12] Revitalization plans, or urban renewal plans, are planning tools, which generally help guide development and revitalization in cities. The SRA previously used a revitalization plan in transforming Somerville’s Assembly Square.
*583 The 2012 Revitalization Plan indicates that it is “a necessary first step to providing both the transit and transit-oriented development (TOD) that will revitalize the Union Square neighborhood.” The Revitalization Plan claims that it was predicated on a community consensus to bring rail transit to Union Square in addition to two previously enacted community processes: (1) comprehensive rezoning in 2009; and (2) “Somerville’s first comprehensive plan, known as the ‘SomerVision Comprehensive Plan.’ ” (Emphasis added.) The Revitalization Plan also confirms that the goals of earlier urban renewal plans for Union Square and Boynton Yards were never realized.
The Revitalization Plan states that the subject properties fall within the boundaries of the North Prospect Block, D-2. It further indicates that the SRA and the city already owns ten parcels within the North Prospect Block but that the remaining parcels, including the subject properties, would be acquired to construct the Union Square Green Line Station and develop the surrounding area. The Revitalization Plan also authorizes $8 million in general obligation bonds to expedite the Union Square Green Line Station construction.
Subsequently, on April 29, 2013, the SRA wrote to the Massachusetts Department of Housing and Community Development requesting approval for the proposed purchase prices of the subject properties. The SRA’s request was approved. Thereafter, on May 29, 2013, the SRA recorded an Order of Taking with the Middlesex County Registry Deeds, which took by eminent domain the subject properties. These suits followed.
DISCUSSION
The SRA’s argument in its motions for partial summary judgment is two-fold. The SRA argues that, under the “project influence rule,” the plaintiffs may not recover enhancement in value attributable: (1) to the public announcement of the 2003 Master Plan, in which the likelihood of the takings were made known; and (2) to the 2009 zoning changes, because they were enacted in furtherance of the Master Plan. Alternatively, under a more narrow interpretation of the project influence rule, the SRA contends that the 2009 zoning changes should nevertheless be disregarded in the just compensation calculation, because the Zoning Amendment was adopted as a necessary predicate to the 2012 Revitalization Plan.
I. Standard of Review
Summary judgment shall be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 714 (1991). When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the nonmoving party but does not weigh evidence, assess credibility, or find facts. Attorney Gen. v. Bailey, 386 Mass. 367, 370 (1982).
In moving for partial summary judgment,[13] the SRA bears the burden of affirmatively demonstrating the absence of a triable issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). It may satisfy this burden by submitting affirmative evidence negating an essential element of the opposing parties’ cases or by demonstrating the opposing parties have no reasonable expectation of proving an essential element of the cases at trial. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis, 410 Mass. at 716. If the SRA establishes the absence of a triable issue, the opposing parties must respond with evidence of specific facts establishing the existence of a genuine dispute. Pederson, 404 Mass. at 17.
II. Project Influence Rule
When property is taken by eminent domain, the property owners are entitled to just, or reasonable, compensation under the Fifth Amendment to the U.S. Constitution and art. 10 of the Massachusetts Declaration of Rights. Generally in Massachusetts, the measure of damages for property taken by eminent domain is the property’s value before the recording of the order of taking. G.L.c. 79, §12. See United States v. Miller, 317 U.S. 369, 374 (1943) (fair market value as of the taking). Under certain circumstances, however, the property’s value may have increased prior to the taking, due to the announcement of or the property’s proximity to a public improvement project. See Miller, 317 U.S. at 376. As a result, the Supreme Court developed the “scope of the project rule,” also referred to as the “project influence rule,” which disregards from the just compensation calculation such increases in value. Id. at 376-77.
To determine the applicability of the project influence rule, the question is whether the land taken was “probably within the scope of the project from the time the Government committed to it.” Id. at 377 (emphasis added). In addition, the application of the rule “to any particular set of facts requires discriminating judgment.” United States v. Reynolds, 397 U.S. 14, 21 (1970).[14] Before the court can determine the applicability of the project influence rule, it must first determine the date in which it would be “fair and just” to trigger the rule. See United States v. 320.0 Acres of Land, 605 F.2d 762, 806 (5th Cir. 1979) (hereinafter, Monroe). In Miller, the Supreme Court determined that the point in which the government commits to a project is “the date of its final and definite authorization.” 17 U.S. at 377 (concluding government committed to railroad project when Congress made last authorization and appropriation). Once that date is determined, it is proper to inform the juiy that the property owners are not entitled to any increases in value arising after that date. Id.
Here, the SRA urges this Court to adopt a broad interpretation of the rule and conclude that, under the *584 2003 Master Plan, the takings were within an area where they were “likely to be taken”; therefore, any increases in value after that date should be excluded from the damages calculation. To support its position the SRA relies on cases such as Cole v. Boston Edison Co., 338 Mass. 661, 666 (1959), quoting Miller, 317 U.S. at 379; and Connor v. Metropolitan Dist. Water Supply Comm’n, 314 Mass. 33, 39-40 (1943) (“[DJamages for land taken shall be fixed at the value thereof before the taking ... in other words, before the beginning of the entire public work which necessitates the taking”). This interpretation, however, does not comport with Millets concept of a “final and definite authorization.” 317 U.S. at 377. Furthermore, more recent cases in Massachusetts suggest landowners are not entitled to an increase in value “where the value of the land [was] enhanced because it [was] known that the land [would] be taken by eminent domain . . .” Bird v. Boston Redev. Auth., 6 Mass.App.Ct. 659, 663 (emphasis added). See Lipinski v. Lynn Redev. Auth., 355 Mass. 550, 553-54 (1969) (“[T]he landowner is entitled to damages equal to the property’s value, unaffected by any knowledge of an impending taking” (emphasis added)).
As distinguished from the 2012 Revitalization Plan, it was not known in the 2003 Master Plan that the subject properties would be taken for the urban renewal project. The Master Plan merely expressed a general interest in redeveloping the city and recognized the Prospect Street Corridor as an area that was ripe for such development. In addition, when the Master Plan was published, the Green Line expansion was only the subject of negotiations; the MBTA did not formally commit to the project until July 26, 2012. As a result, the Master Plan did not provide the property owners with adequate notice that their lands might be taken in conjunction with the project. As the court in Monroe stated: “[T]he appropriate date is largely a function of reasonable expectations. It is the date as of which the landowners or prospective purchasers no longer could reasonably anticipate being able to devote these properties to their highest and best use . . . [I]t is the date as of which the prospect of imminent condemnation becomes sufficiently definite that it would be a major factor in the decision of any reasonable person to buy or develop the property.” 605 F.2d at 807.
In contrast, the Revitalization Plan categorized the subject properties as part of Block D-2, from which it became known that all of D-2 was directly targeted for acquisition. Furthermore, the Revitalization Plan was adopted pursuant to G.L.c. 121B, which gave the SRA legal authority to take land within the project area by eminent domain, unlike the so-called “Master Plan.” Moreover, the language of the Order of Taking confirms that the takings were made pursuant to a G.L.c. 12 IB Urban Renewal Plan.
Accordingly, the date on which it was sufficiently known that the subject properties were likely to be condemned is October 2, 2012, when the Revitalization Plan was published.[15] Notwithstanding, the summary judgment record indicates that on August 16, 2012, Prospect Iron was notified by Somerville’s Mayor, Joseph A. Cúrtateme, that its property was identified as land targeted for acquisition in connection with the Revitalization Plan. Since this letter represents actual notice that the subject property was going to be taken by eminent domain, the letter acts as the operative date for valuation with respect to Prospect Iron. If the evidence ultimately establishes that the remaining property owners received similar notices, then the date of valuation for them would similarly be August 16,2012, rather than October 2, 2012.[16]
III. 2009 Zoning Amendment
The SRA, alternatively, requests that this Court exclude the 2009 Zoning Amendment from the damages calculation, because such changes were adopted as a necessary predicate to the 2012 Revitalization Plan. This amendment, which was adopted four years before the takings, permitted a broad range of retail, commercial, and residential uses, which were previously prohibited in the subject zoning district.
As stated earlier, land owners are entitled to the fair market value of the property before the recording of the order of taking. See Boston Edison Co. v. Massachusetts Water Resources Auth., 459 Mass. 724, 731 (2011). “The fair market value is the highest price a willing buyer would pay to a willing seller in a free and open market based on the highest and best use of the properly.” Id. “Consideration of the highest and best use is not limited to the use of the property at the time of the taking but includes ‘potential uses of land that a reasonable buyer would consider significant in deciding how much to pay.’ ” Rodman v. Commonwealth, 86 Mass.App.Ct, 500, 504 (2014), quoting Boston Edison Co., 459 Mass. at 731. A highest and best use must be legally permissible, physically possible, financially feasible, and sufficiently imminent to be taken into account by a reasonably prospective buyer. Id. at 505. “Existing zoning restrictions or special permit requirements limit available uses and may affect the fair market value of property.” Douglas Envtl. Assocs., Inc. v. Department of Envtl. Protection, 429 Mass. 71, 76(1999).
In Standish Mgt., Inc. v. Randolph Hous. Auth., the Appeals Court dealt with a similar issue to the one presented here, in which prior to the taking, the town amended the zoning classification to permit apartment uses. 26 Mass.App.Ct. 901, 902 (1988). The Appeals Court concluded that admission of such evidence was “within the sound discretion of the trial judge.” Id. The court also held that the trial judge properly instructed the jury that it might consider the rezoning as a factor in deciding whether a reasonable buyer would have considered the likelihood of rezoning at the time of the taking. Id.
Here, the jury may similarly consider the evidence of rezoning as a factor in determining the fair market value at the time of the takings in light of what a reasonable *585 buyer would have considered at the time of the takings. ‘The task for the judge is to ‘avoid unreasonably restricting the efforts of the owner[s] fairly to show the effect of the taking upon the market value of the affected property at the time of the taking . . . without permitting damages to be inflated by unduly detailed and confusing proof of speculative future uses of property having no very direct relationship to market values at the time of the taking.’ ” Rodman, 86 Mass.App.Ct. at 506, quoting Boston Edison Co., 459 Mass. at 732. In light of the Court’s ruling that the takings were not known until August or October 2012, and because the Zoning Amendment was enacted three years prior, in 2009, the jury may consider the 2009 Zoning Amendment as a factor in valuation, and should be so instructed.
ORDER
For the foregoing reasons, it is hereby ORDERED that the SRA’s motions for partial summary judgment are DENIED, the dates of valuation shall be as stated in this decision, and the 2009 Zoning Amendments shall be admitted in evidence at trial.

 When the Boynton Yards Plan was later approved by the Massachusetts Department of Housing and Development, it became an official urban renewal plan, pursuant to G.L.c. 121B, which qualified the project for federal financial assistance and authorized the SRA to acquire and develop property.

 The parties disagree on whether the subject properties were targeted for land acquisition and assembly in the second phase of the Boynton Yards Plan; however, this factual dispute is immaterial since the SRA concedes that the second phase was abandoned.

 The NRSA Plan was subsequently amended in 2008.

 The record is silent on whether the Master Plan satisfies the legal requirements of “Master Plans” as stated in General Laws c. 41, §81D.

 The SRA contends, although disputed, that the subject properties fell within the Prospect Street Corridor. While none of the properties are explicitly named in the Master Plan, they are generally located on maps contained therein.

 In an agreement dated July 26, 2012, the MBTA committed to undertake a phased approach to constructing a Green Line extension, which included a new station at Union Square.

 A city’s planning board shall make a master plan as the board deems advisable from time to time. G.L.c. 41, §81D. “Such plan shall be a statement, through text, maps, illustrations or other forms of communication, that is designed to provide a basis for decision making regarding the long-term physical development of the municipality.” Id. There are statutory elements, which must be included in the plan. Id.

 On October 9,2012, the SRA approved the Revitalization Plan, and on November 19, 2012, it was approved by the Massachusetts Department of Housing and Community Development.

 An “urban renewal plan” is a detailed plan for an urban renewal project, which may comply with federal requirements in order to qualify for federal financial assistance, and it must be approved by municipal officers and the Department of Housing and Community Development. G.L.c. 121B, §1. “When the urban renewal plan . . . has been approved by the department and notice of such approval has been given to the urban renewal agency, such agency may proceed at once to acquire real estate within the location of the project ... by eminent domain . . .” G.L.c. 12 IB, §48.

 The parties opposing summary judgment on this motion contend that partial summary judgment is not the appropriate legal remedy to decide these issues. “Because the facts material to this issue are not in dispute, and because resolution of th[ese] issue[s] will significantly narrow the remaining issues for trial,” as discussed below, this Court concludes that partial summary judgment is the appropriate resolution of the motion. Eastern Mgt. & Dev., LLC v. Padula, 22 LCR 83, 84 (2014).

 Although the SRA and the property owners agree that the applicability of the project influence rule is a preliminary matter that should be decided by this Court, Deutsche Bank contends that it is a determination reserved for the fact finder. The Supreme Court, however, has already decided this issue, and Deutsche Bank has not cited any contradicting authority. See Reynolds, 397 U.S. at 20.

 The opposing parties argue that the date of valuation should be April 29, 2013, when Somerville appropriated funds forthe project; however, this interpretation is too broad. In accordance with Monroe, the date of publication of the Revitalization Plan is the final date upon which the property owners could have anticipated being able to use their properties for their highest and best use. 605 F.2d. at 806-07.

 In light of this ruling, this Court need not decide the SRA’s argument with respect to the nexus between the 2003 Master Plan and the 2009 changes in zoning.